John Frederick Wallach et al., Appellees, v. Cornelius K. G. Billings et al., Appellants.

Gen. No. 17,275.

1. INJUNCTIONS—*what essential to justify the interposition of equity to protect interests of minority stockholders seeking to enforce liability of director for neglect of duty.* It is not necessary to justify the action of the court in granting a temporary injunction that it should be clearly established that the failure of the director defendant to attend the meetings of the board of directors and his consequent lack of knowledge of and participation in the affairs of the corporation created an absolute liability against him for losses which the corporation suffered; nor is it important whether such director's liability, if any exists, is the large amount claimed or a much smaller amount. It is sufficient in the interlocutory proceeding if the record establishes a *prima facie* liability of some amount on the part of the director to the corporation.

2. INJUNCTIONS—*when issuance without notice improper.* The issuance of a temporary injunction without notice to the defendants who were readily accessible to notice is improper in the absence of the setting up of verified facts from which the court might conclude that irreparable injury might result from giving notice of the application.

3. INJUNCTIONS—*when issuance against national bank improper.* By virtue of section 5242 of the Revised Statutes of the United States, it is improper to grant a preliminary injunction against a national bank, or against its officers or directors, or against its property (where the injunction against such officers, directors or property is the equivalent of an injunction against the bank), even after it has ceased to be a going concern and the sole controversy in the case is one between the shareholders.

4. CORPORATIONS—*when equity will interfere with the ordinary powers of directors.* . While it is ordinarily true that courts of equity will not interfere with the internal affairs of a corporation where the acts complained of are *intra vires,* yet where the corporation has ceased to be a going concern and all that remains to be done with respect to its affairs is to make distribution of its assets among the stockholders, the discretion of the directors may be interfered with in a proper case to prevent the compromise of a claim which compromise might result prejudicially to the interests of minority stockholders.

5. RECEIVERSHIPS—*when appointment proper with respect to affairs of national bank.* If a national bank has ceased to be a going concern, its creditors having been paid in full and nothing remaining but the collection of its assets and their distribution among the stockholders, the appointment of a receiver of· a claim by such bank against a director for a neglect of duty, is proper, in order that there may properly be determined the propriety of accepting an offer of compromise of such claim and in order further that such claim may be enforced if not compromised and a distribution of the proceeds thereof, whether compromised or enforced, may be made among those entitled thereto, the rights of those entitled thereto not being altogether clear, and no other remedy appearing than that of a receivership by which all the questions involved could be properly and satisfactorily settled.

Bill in chancery. Appeal from the Circuit Court of Cook county; the Hon. RICHARD S, TUTHILL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Reversed in part and affirmed in part. Opinion filed April 18, 1911.

**Statement by the Court.** On the 16th of July, 1910, John F. Wallach, Mary B. G. Harding, The Northern Trust Company, as trustee for the heirs of John J. McGrath, and A. G. Becker, as complainants, filed a bill in the Circuit Court of Cook county against Cornelius K. G. Billings and the Chicago National Bank, a corporation. The bill was on behalf of them-

selves, as minority stockholders of the Chicago National Bank, and of all other stockholders of the Bank who may choose to come in.

The bill alleges that the Chicago National Bank was organized under the National Banking Act in the year 1881; that its capital stock from 1901 was $1,000,000, divided into 10,000 shares of $100 each. During the years 1901 to 1904, inclusive, and down to the 18th of December, 1905, John R. Walsh was its president, and John R. Walsh, Fred M. Blount, John M. Smyth, Fred G. McNally, William Best, Morris Rosenfeld and Cornelius K. G. Billings were its directors; that Walsh dominated and controlled the affairs of the bank, and that by virtue of such domination and control he was able to and did obtain large loans of money either to himself or to certain corporations, referred to as "Walsh Corporations," which loans were made upon fictitious promissory notes, or to corporations wholly insolvent, or were secured by worthless and unmarketable bonds and other alleged securities; that, as a result of such operations by Walsh in making loans to himself and to his corporations wholly unsecured or inadequately secured, the comptroller of the currency of the United States compelled the bank to close its doors on the 18th of December, 1905.

That at the time the Bank was closed, the associated banks of Chicago, pursuant to an agreement between them and The Chicago National Bank and its various directors, except Billings, took possession of all of the assets of the Bank and paid all of its depositors and other creditors in full; that such associated banks remained in possession of such assets, realizing a portion of the moneys which they had advanced for the payment of depositors and other creditors, until about July 2, 1907, when a settlement was made between the Bank and its former directors (other than Billings) on the one hand and the associated banks on the other, by which the latter returned to the Bank such assets as remained after having paid all the Bank's depositors

and other creditors; that such assets as were returned were worthless, and that nothing has since been realized therefrom; that because of the acts of said Walsh the entire capital and surplus of the Bank were lost, and its good will destroyed.

The bill further charges that Billings, though continuously a director from 1901 until after the date of the closing of the Bank, nevertheless attended almost none of the meetings of its board of directors, but left the entire management and control of the institution to Walsh; that if Billings had properly attended to his duties as a director the losses incurred by the Bank would have been prevented, and that if he had made proper inquiry with reference to the Bank's management he would have been able to compel Walsh to restore to it the moneys so misapplied.

The bill further alleged that the complainants had caused a demand to be served upon the present board of directors that they institute an action against Billings to cause him to account to the Bank for his failure to properly perform his duties as a director, but it alleges that the Bank and the directors have neglected and refused to institute such proceedings, wherefore this bill is filed on behalf of complainants and all other stockholders similarly situated, etc.

The bill prays that an accounting may be had with Billings and that he may be compelled to pay the Bank for the use of its stockholders such an amount as may be found to be due from him on account of his failure to perform his duty as such director; or that Billings may be compelled to account to the complainants their proportionate amount of the sum so found to be due from Billings on account of his said neglect as a director.

Billings has not been served nor has he appeared in the proceedings.

The Chicago National Bank was promptly served with summons upon the filing of the bill, but on the 21st of November, 1910, the complainants appeared

in the Circuit Court of Cook county, without notice to the defendant Bank, and obtained leave to file a supplemental bill, which was filed instanter. The supplemental bill alleged that the complainants had theretofore filed in the United States Circuit Court at New York a bill of complaint similar to the original bill in this case, and that the cause in New York was then pending upon Billings' demurrer to their bill; that complainants had been unable to secure services of process in the original bill herein upon Billings, though he was fully advised of the pendency of such proceedings, and alleged that Billings' liability in this case approximated $3,500,000; that it was his intention and that of the board of directors of the Chicago National Bank to allow him to escape from and cancel his liability to the bank by payment to it of about $158,000; that the Bank directors are in charge of the records and papers of the Bank; that Billings had conducted negotiations with them with a view of compromising his liability for a trifling amount as compared with that for which he is actually liable, so that he might set up and use as a defense to the proceedings instituted by the complainants such settlement so made with the Bank directors.

The supplemental bill further alleged particularly that Billings' offer is for a release of all his liability as a director, and that in pursuance of the understanding and the agreement between Billings and the Bank directors the latter had caused a meeting of the stockholders of the Bank to be called for November 22, 1910, for the purpose of considering said proposition of Billings to pay said money to the Bank in consideration of the release of all claims of whatsoever nature which the Bank had against him.

The supplemental bill further alleged that the meeting thus called was not in compliance with the by-laws of the bank because the notice of the meeting was given only four instead of five days as required, and that accordingly such meeting would be unauthorized and

illegal; that the Bank directors intend to and will, unless restrained by the court, at said meeting of stockholders, cause to be passed resolutions permitting the proposed settlement; that by reason of their ownership and control of the majority of the capital stock of the Bank, they will, unless restrained, pass resolutions embodying the agreement with Billings, to the detriment of complainants and other minority stockholders.

The supplemental bill further alleges that the Bank directors in calling and holding such stockholders' meeting are not acting in the interest of the Bank, and all its stockholders, but for the purpose of defeating the complainants in the prosecution of this suit; that the complainants are advised that even if the stockholders should ratify the proposed settlement there is grave doubt whether it would be binding upon the complainants, but it would raise a question which would embarrass complainants in this suit.

The supplemental bill further alleges that Walsh has been convicted for misapplication of funds of the Bank, for which he is serving a sentence in the penitentiary; that the directors are in possession of the books, papers and records of the Bank, and will do what they can to shield and protect Billings and will prevent and obstruct complainants from having access to said books and records, and ''That it is fair and equitable that some disinterested person, as an officer of this court, should have possession, custody and control of said assets, papers, books and records, and should make the necessary investigations and prepare the evidence for hearing in said proceedings for and in the interest of all parties concerned.''

The supplemental bill further alleges that since December 18, 1905, the Bank has not been doing any business; that all creditors have been paid, and there only remains for the Bank to enforce the liability of Billings, and that the assets of the Bank outside of Billings' liability, amount practically to nothing, and that

in view of all the circumstances a receiver of the Bank should be appointed for the protection of complainants and other stockholders; such receiver to take whatever should be realized from the claim against Billings and, under the direction of the court, to adjust or settle with Billings, and to make proper distribution among the stockholders of whatever may be realized upon such claim.

The supplemental bill also prays for an injunction restraining the holding of the proposed stockholders' meeting; that a receiver may be appointed over the assets, papers, books, records and property of the Bank, with the usual powers of a receiver.

The supplemental bill was verified by one of the complainants, but the original bill was not sworn to.

Immediately upon filing the supplemental bill, and without notice to any of the defendants, although the appearance of the Chicago National Bank had been for several months on file in the case, the court granted an injunction restraining the Bank and its Board of Directors from consummating, or attempting to consummate, the proposed settlement with Billings, or from holding or attempting to hold the proposed stockholders' meeting, or taking any action to accept Billings' proposition of settlement, ''or any like proposition which would be in any way calculated or intended to condone the alleged fault and negligence of said Billings, and from accepting or attempting to accept, on behalf of said Bank, said proposition of Billings, or any like proposition, and from doing any thing that may in any manner affect the rights and interests of the complainants and other stockholders of the Bank with respect to the alleged liability of said Billings.'' The court required an injunction bond in the sum of $1,000 to be filed within five days.

The supplemental bill brought in as additional defendants Florus D. Meacham, James J. McCarthy, Thomas M. Jackson, William J. Onahan, A. B. Kuppenheimer, John M. Ryan and Sylvester P. Blount,

and prayed an injunction against them "and each and all the stockholders of the defendant The Chicago National Bank, and each and every party claiming and pretending to act as a proxy for any such stockholder;" that the Bank, Meacham, McCarthy, Jackson, Onahan, Kuppenheimer, Ryan and Blount, and each of them individually and as stockholders, officers and directors of the Bank be enjoined and restrained from taking or attempting to take any action, or doing or attempting to do anything that may in any way or manner affect the rights and interests of the stockholders of the Chicago National Bank with respect to the alleged liability of Billings; that upon a final hearing the amount of Billings' liability may be ascertained and he decreed to pay the same; that a receiver be forthwith appointed of the defendant, The Chicago National Bank, with the usual power of receivers in such cases.

Shortly after the granting of the injunction appellants appeared and moved to increase the injunction bond from $1,000 to $175,000, and filed affidavits showing a probability of loss if the injunction should remain in force. This motion was denied.

On the second day of December the defendants filed their answer, admitting many of the allegations of the bill, particularly with reference to the organization and management of the Bank, but denying that Billings' liability, if any exists, aggregates anything like the sum of $3,500,000 alleged in the bill, but that it is, in no event, in excess of $700,000. The answer denies any wrongful conduct on the part of the defendants with respect to the claim against Billings, but alleges that $152,125, offered by him, is a large and substantial part of any possible recovery which could be had against him; they deny having refused to institute proceedings against Billings, or that they intended that none such should be instituted; they aver that they declined to institute the suit in the United States Court in New York, having been advised that it would be without avail, and

that it would entail large expense upon the Bank; they allege that the proposed stockholders' meeting was called in good faith by the directors for the purpose of allowing the stockholders to consider and decide upon the question of acceptance or rejection of the offer; they deny that they have agreed with Billings, or intended to, or would, unless restrained by the court, adopt resolutions or take proceedings at the stockholders' meeting settling the claim against Billings, unless, upon due consideration, and in the opinion of the majority of the stockholders, it should be deemed for the best interests of the stockholders to accept such proposition.

The answer further avers that the holdings of the defendant directors in the Bank do not exceed 6 per cent. of the capital stock; denies any intention of controlling or influencing the action of the stockholders at the proposed meeting.

The answer avers that in all of their proceedings with respect to their claim against Billings they have acted in entire good faith, for the interests of the Bank and of all its stockholders; it avers that in their opinion the assets of the Bank, independently of any liability of Billings, are of the value of at least $250,000, and that many of the assets of the Bank are of such a character that if they are administered by a receiver, in the ordinary practice of chancery, a large part of the value of the assets would be lost to the stockholders.

The answer further avers that the bill and the supplemental bill were not filed by complainants in good faith, but were for the purpose of obtaining undue advantage over the other stockholders, and in pursuance of a fraudulent scheme of the complainants to force Billings to settle with them to the exclusion of the other stockholders.

They aver that in their opinion the proposed settlement would net to the Bank and its stockholders a larger sum than would result from continued litiga-

tion over the alleged liability of Billings,—he being a non-resident of Illinois.

The answer was sworn to by all of the directors, and attached to it was an affidavit detailing specifically the steps taken to procure from Billings the proposition of settlement and denying in detail all charges of fraud in relation thereto.

Subsequently, the defendants moved the court to dissolve the preliminary injunction on the grounds of (1) want of jurisdiction of the subject-matter; (2) lack of equity, appearing on the face of the bill and supplemental bill; and upon the answers of the defendants and the affidavits filed in support thereof. Upon a hearing the court refused to allow the reading of the affidavits and the motion was heard upon oral evidence in open court. At the same time, the court heard the motion of complainants to appoint a receiver.

At the conclusion of the evidence heard before the court upon the motion to dissolve the preliminary injunction and the motion for the appointment of a receiver, the complainants amended their supplemental bill by setting up specifically a resolution of the directors of the Bank, calling the stockholders' meeting and alleging that a majority of the shares of the stock of the Bank was held by former directors or the estates of former directors, or by persons closely related to such former directors "by consanguinity or affinity," and by persons who had been officers of the Bank; and alleging that a person friendly to Billings threatens and had threatened his co-directors to institute a suit against them unless they should vote in favor of the said proposition of settlement; that The Chicago National Bank had been, since July, 1907, represented by a law firm which had previously been private counsel for Mr. Walsh, and that one of the members of said firm had expressed it as his opinion that the offer made by Billings was advantageous, and was larger in amount than the Bank was likely to obtain as a result

of litigation; the amendment further charged that the large sum of $40,000 had been paid to said firm of attorneys, for service alleged to have been rendered the Bank between the date of its suspension and March 31, 1908, which services, it is averred, were in fact rendered to Walsh; that it is uncertain who of the stockholders would obtain the proceeds of any settlement with Billings because of the fact that certain shares of stock were held by Walsh and his co-directors, and allege that differences of opinion with reference thereto would prevent the distribution of any moneys received until the questions at issue could be finally settled by a decree of court.

Complainants further amended the supplemental bill by alleging that Billings had large property interests in Illinois, and prayed that the receiver be authorized to bring attachment suits to subject his property situated in Illinois, to liability for his misconduct.

The injunctional order entered by the court on the 21st of November, 1910, without notice and upon $1,000 bond to be filed within five days, enjoined the defendants, each of them, and each person claiming to be a proxy for any such stockholder, and the solicitors, attorneys, representatives and agents of each, from holding or attempting to hold such proposed meeting of stockholders on November 22, 1910, or any other meeting pursuant to the notice given, and from consummating or attempting to consummate the proposed settlement and adjustment of the liability of Billings, and from taking any action or adopting any resolution to accept the proposed settlement with Billings, or any like proposition which would be in any way calculated or intended to condone the alleged fault and negligence of said Billings, or from accepting or attempting to accept on behalf of said Bank the said proposition made by Billings, or any like proposition, and further taking or attempting to take any action, or doing or attempting to do anything that may in any way or man-

ner affect the rights and interests of the complainants herein and other stockholders of said Bank with respect to the alleged liability of said Billings.

On December 20, 1910, at the conclusion of the hearing of the motion to increase the bond, and the separate motion to dissolve the injunction, and also the motion of the complainants for the appointment of a receiver the court entered an order in substance to the following effect:

1.   That the defendants' motion to dissolve the injunction be overruled.

2.   The defendants' motion to increase the injunction bond be overruled.

3.   That the injunction of November 21st be modified by striking out the name of the Chicago National Bank, so that the injunction will run against defendants, who are directors in said bank, and against "all officers, directors and stockholders of the Chicago National Bank, and each person claiming to be a proxy for another stockholder, the solicitors, attorneys, representatives and agents of each and all persons hereinbefore referred to, other than The Chicago National Bank."

4.   That William C. Niblack be appointed receiver of all claims and demands and rights of action of The Chicago National Bank against the defendant, C. K. G. Billings, arising out of, or resulting from his failure to properly perform his duties as a director of the Bank, and authorizing him to prosecute any suit or action within or without the State of Illinois as he may be advised is necessary or proper to enforce the claim against Billings.

5.   Enjoining and restraining all the officers, directors and stockholders of the Bank from in any manner delaying, harassing, obstructing or impeding any such suit or suits, action or actions, proceeding or proceedings, which may be so instituted by said receiver, by attempts to compromise, settle or realize claims, demands, causes or rights of action, or in any other way

or manner in interfering, by the use of the receiver of the name of the Bank, in commencing or prosecuting any such suit or suits, and ordering all parties to the suit, who may have in their possession or under their control, any books, papers, documents, or any other property relating to said claim against said Billings, to permit the receiver to use, inspect and examine them at all proper times.

6.   Overruling the motion of defendants to dissolve the injunction as so modified.

Upon the hearing which resulted in the order of December 20, 1910, from which defendants appealed, the court below refused to hear affidavits, and the witnesses were heard to testify orally.  Wallach, the complainant who made affidavit to the supplemental bill, was examined as to the allegations in his affidavit, touching the necessity for the injunction without notice.

William J. Onahan, one of the directors of the Bank, also testified.  He specifically denied the fraud charged in the supplemental bill, and testified that he was familiar with the affairs of the Bank and the situation as it stood at the time, and that in his opinion and judgment as a business man, the proposed settlement with Mr. Billings was an advantageous one for the stockholders, and, further, that no motive other than the interests of the stockholders prompted or influenced him in his attitude and action.

Thomas N. Jackson, one of the directors, also testified that he had been employed in the Bank for many years, having been cashier continuously from 1901 till its suspension in 1905, and that he continued to be familiar with its assets since that time.  He also testified that in his opinion as a business man, the proposed settlement with Billings was an advantageous one, and further, that his conclusion was not prompted by any motive other than the desire to realize the most that could be obtained for the stockholders.

After the cross-examination of both of these witnesses, it was stipulated that all the other defendant di-

rectors, if put upon the stand, would make the same statements with reference to their good faith in the matter of the proposed settlement, to which was added a statement made by the chancellor, that he had no doubt they had so acted in entire good faith, and that they were not influenced by their regard for Mr. Billings.

There also developed upon the hearing testimony showing that of the securities alleged in the original bill of complaint to have been wrongfully purchased by The Chicago National Bank, through the manipulation of Walsh, and charged to be worthless, a large part of them have been sold and disposed of at as much as the price at which the Bank had acquired them.

James F. Meagher, Esq., counsel for Mr. Billings, testified quite at length; describing the manner in which Mr. Billings had been induced to make the offer, which amounted to $152,125. He stated, in substance, that Mr. Billings insisted throughout, and was advised by his counsel, that he was not in any manner liable to the Bank or to its stockholders, but that his proposition, which was made after several interviews between himself, or his counsel, with the legal representative of complainants, and with Lessing Rosenthal, Esq., who represented Mr. Rosenfeld, one of the former directors of The Chicago National Bank, and also a number of other stockholders, with Mr. Hart, counsel for the Bank, and with him and the directors of the Bank, from which it had been made to appear that the other directors of the Bank, all of whom reside in Chicago, had suffered large pecuniary losses, in aiding the Bank, and subsequent to the time of its suspension; and that it would be regarded as exceedingly considerate of him if he were to make contribution to the Bank, and thus share, to that extent, the misfortune of his co-directors; that though it was conceded that he had not attended any of the directors' meetings of the Bank after the middle of 1902 until after the time of its suspension, that it was not expected, when he was elected director, that

he would attend directors' meetings, because it was well known that his residence was in the city of New York; that his election by the stockholders as a director and his continuing as such was for the purpose of securing to the Bank the deposits of himself and of other large financial interests, whose banking accounts he controlled, and from all of which the Bank had on deposit, at the time of its suspension, more than one million two hundred thousand dollars.   The amount of $152,125 was reached upon an understanding that it would be sufficient to pay all the stockholders, not directors at the time of the closing of the Bank, twenty-five per cent of the par value of the stock.

Mr. Rosenthal and Mr. Hart severally testified that the question of Mr. Billings' liability to the Bank was an exceedingly difficult and complicated one, and each stated that in his opinion the proposed settlement was an advantageous one from the standpoint of the stockholders of the Bank.

Lucien E. Harding, Esq., husband of Mrs. Harding, one of the complainants, also testified that the question was a complicated one and one upon which lawyers might disagree.

It appeared from the testimony taken at the hearing, that upon December 18, 1905, when the Bank had been suspended by order of the Comptroller of Currency, the Associated Banks of Chicago took over all the assets of the Chicago National Bank, and in return guaranteed the payment of all its deposits and all its debts.   These Associated Banks were guaranteed against loss by the directors of The Chicago National Bank, other than Billings, and to relieve themselves from such guarantee these directors severally made large contributions, aggregating over $600,000 in cash; that pursuant to these arrangements the Associated Banks, through the First Trust & Savings Bank as their Trustee, took possession of all the assets of the Chicago National Bank, and retained them until a settlement was made, about July 1, 1907, as a result of

which, and of the previous sale of assets by the First Trust & Savings Bank, and the cash payments by the directors above referred to, the indebtedness guaranteed by the Associated Banks was provided for, and the remaining assets were turned back to The Chicago National Bank and that, though such assets were alleged to be worthless, and were not deemed by the Associated Banks to have much value, nevertheless the directors had, before the date of the hearing, succeeded in realizing therefrom more than $63,000 in cash; and the testimony at the hearing was that the remaining assets were worth at that time approximately $300,000.

It further appeared upon the hearing, that prior to the suspension of The Chicago National Bank, its capital stock had a market value of at least $350 per share, and that some of the complainants paid even more than that for a portion of the stock held by them.

It further appeared that of the assets in the possession of The Chicago National Bank at the time of the hearing, there was nothing except about $45,000, face value of bonds, alleged to be worth about seventy cents on the dollar, which were assets of the Bank at the time Billings was a director, and that Billings had in no wise assisted in the shifting or changing of the assets.

It further appeared that complainant Becker had, at the request of the Associated Banks, acted as president of The Chicago National Bank from January, 1906, to July, 1907, and that he had at no time, until the begining of the proceedings in this case, taken any steps to enforce the alleged liability of Billings, or that of any other director of the Bank; that early in 1910, through his solicitor of record, he made a formal demand, in general terms, on the directors, to institute suit to recover from the directors for the alleged failure to perform their duties; that after such demand, and during the negotiations which followed, his solicitors prepared a bill of complaint against Billings and the Bank, which was filed in the United States Court in New

York, the directors having given permission to institute such proceedings, which are still pending there, upon the demurrer of Billings; and that without any further request on the part of complainant, the original bill herein was filed, concerning which complainant Becker testified that it was untrue that he had filed the suit in bad faith; that he knew it was brought for the benefit of every stockholder, and that he could not get a dollar more than any other stockholder, in proportion to his holdings.

It further appeared in evidence that, the present defendant directors had paid to the attorneys of the Bank, who were also attorneys for Walsh, approximately $36,000 for services, and while complainants contend that the services so rendered were for and should have been charged to Walsh, yet there was testimony offered tending to show that the services were rendered the Bank, and that the charge therefor was reasonable, it having resulted in bringing to the Bank assets of the value of over $250,000.

It also appeared that The Chicago National Bank directors had had fifty-three directors' meetings from 1900 down to the date of the suspension of the bank, of which Billings attended three in 1901 and three in 1902, the last being on July 2, 1902, and that though Billings was in Chicago as often as two or three times a month, he attended no other meetings than those mentioned, nor did he ever make any special effort to ascertain the condition of the bank's business.

Mr. Jackson, the bank's cashier, testified that he did not remember to have seen Mr. Billings in the bank at any time during 1904 or 1905. There was also shown a letter from the comptroller of the currency, dated June 26, 1905, calling attention to the large amounts improperly loaned by the bank to corporations in which Mr. Walsh was interested, as well as to others, and requiring of the directors that they take prompt action to remove these causes of complaint,

but that little, if any, improvement was made in conditions before the suspension of the bank; that largely by reason of these improper, excessive, fictitious and inadequately secured loans, made by Walsh, president of the bank, and which appeared to have been permitted by the directors, because of the representations made by Walsh concerning such loans, and their personal confidence in him at the time the bank was suspended, large losses resulted to the stockholders.

To the action of the court below in entering the order of December 20, 1910, the defendants assigned the following errors: (1) That the court erred in refusing to dissolve the original injunction; (2) that the court erred in entering the modified injunction; (3) that the court erred in denying appellants' motion for an increase in the injunction bond; (4) that the court erred in refusing to dissolve the modified injunction; (5) that the court erred in appointing a receiver; (6) that the court erred in entering the order of December 20, 1910, or in entering any part thereof.

CALHOUN, LYFORD & SHEEAN and MONTGOMERY, HART & SMITH, for appellants.

NEWMAN, NORTHROP, LEVINSON & BECKER, for appellees; JACOB NEWMAN, ARTHUR B. SCHAFFNER, MILTON J. FOREMAN and CHESTER E. CLEVELAND, of counsel.

MR. JUSTICE BALDWIN delivered the opinion of the court.

To secure a reversal of the judgment of the court below, defendants here urge: (1) that the action of the trial court in granting the injunction and in refusing to dissolve it, amounts to a usurpation of the functions of its directors and stockholders; (2) that in the absence of fraud, a court of equity has no right to intervene by injunction, or by the appointment of a receiver in the settlement of the internal affairs of

the corporation; (3) that the injunction granted is in direct violation of section 5242 of the U. S. Statutes, which prohibits the issuance of an attachment, injunction or execution against a national bank before final judgment in any suit, action or proceeding in any state, county or municipal court, and that the modification of the injunction by making it run only against the directors, stockholders and officers of the bank, was a mere subterfuge, and amounted, in effect, to an injunction against the bank itself; (4) that the granting of the injunction without notice was unwarranted; (5) that the injunction should be dissolved, because the evidence failed to support the allegations of fraud on the part of the defendants; (6) that the issuance of the injunction, preventing the bank from recovering $152,125, upon the filing of an injunction bond of only $1,000, was oppressive and an abuse of di tion; (7) that the appointment of a receiver f . purpose of prosecuting proceedings against Billings was unwarranted by the pleadings or by the evidence; (8) that the appointment of the receiver and granting the injunction as an incident thereto, are in fact wrongfully taking from the bank, its directors and stockholders, powers which are inherent in them.

Appellees contend that the propriety of the appointment of the receiver is not before this court; because no appeal was taken from the specific part, in the order of December 20th, which appointed the receiver, and that the receivership, being merely of the cause of action against Billings, does not interfere with the general affairs of the bank; that the minority stockholders, having begun this suit, are entitled to conduct it to a termination, and to have the majority stockholders prevented from settling or destroying the cause of action; that the minority stockholders, who instituted this proceeding against Billings, after the bank, upon which a demand had been made, had failed or refused to do so, are entitled to control and con-

tinue the litigation free from interference or attempt by the majority stockholders to settle or destroy the cause of action; that Billings owed to the complainants, and all other stockholders, as well as the bank, the duty intelligently and honestly to administer the affairs of the bank, and that he grossly neglected his duty in that regard, and, therefore, is liable for the resulting damage to the bank and its stockholders; that the interests of the majority of the stockholders of the bank, with respect to the claim against Billings, are opposed to the interests of the minority of the corporation itself, and, accordingly, the majority have no right to pass upon the Billings' claim in any manner affecting or destroying the rights of the complainants; that as the order of December 20th excluded the bank from the injunctional part, there is no injunction against it, and there is nothing in the Federal Statute against the appointment of a receiver, under the circumstances of this case,—the provisions of the statute referring to injunctions not applying to the present case, because the bank had ceased to do business and was not carrying on the functions for which it was organized.

The complainants in this case represented 1313 shares out of a total of 10,000 shares of the capital stock of the bank. On the stock remaining 4427 shares were owned by men who were directors and officers of the bank when it failed in December, 1905, and are charged with dereliction of their duty as directors and officers, in allowing John R. Walsh to dominate the bank and divert its moneys to corporations in which he was interested, and which resulted in great loss to the bank. Four hundred and seventy-six shares were held by the immediate relatives of the officers and directors referred to, while 330 more were held by interests closely identified with the directors during the period mentioned. The remaining 4767 shares, which includes the 1313 shares owned and

represented by complainants, are less than a majority of the stock.

It was not necessary, to justify the action of the court below, that it should be clearly established that the failure of Billings to attend the meetings of the Board of Directors during the entire period from July, 1902, to the time of the suspension of the bank, and his consequent lack of knowledge of and participation in the affairs of the bank created an absolute liability against him for losses which the bank suffered by reason of the improper use of its assets by Walsh; nor is it important whether Billings' liability, if any exists, is to the large amount of three and one-half millions, as asserted by the complainants, or is a very much smaller amount. It is sufficient, in this interlocutory proceeding, if the record establishes a *prima facie* liability of some amount on the part of Billings to the bank, and this we think it does.

Appellants contend that courts of equity have no inherent power to manage internal affairs of a corporation, and they cite a large number of authorities to support the contention that courts of equity will not interfere with the internal affairs of a corporation, where the acts complained of are *intra vires*.

It will be conceded that, as a general proposition, the contention is correct and is fully sustained by the authorities cited; but this bank has no creditors and is simply engaged in collecting in its assets, that they may be distributed among the stockholders. Ordinarily the directors of a corporation, regularly elected, have the full responsibility of the administration of its affairs; nor can there be any disagreement with appellants' contention, that ordinarily directors of a corporation, in the exercise of honest discretion, may compromise a claim, or ever refuse to institute a suit, and abandon a *bona fide* claim without consideration, if, in their opinion, such action will be for the benefit of the majority of the stock. But the situation pre-

sented here is not that of a going corporation, actively engaged in the business for which it was created; but is one where, for nearly five years, the corporation had transacted no banking business.

The injunction entered by the court below on the 21st of November, 1910, was issued without notice to the defendants, or any of them, though the court was sitting within a few blocks of the offices occupied by the defendants. The affidavit upon which it was based does not seem to us sufficient, under the statute, to justify the issuing of a temporary injunction without notice. No sufficient facts are shown from which the court can conclude that irreparable injury would result from giving notice of the application.

Appellants insist that the preliminary injunction granted herein was manifestly erroneous, because it was in direct violation of section 5242 of the Revised Statutes of the United States, and a large number of cases are cited to support this contention. The section referred to provides that "no attachment, injunction or execution shall be issued against any such association (a national bank) or its property before final judgment, in any suit, action or proceeding in any state, county or municipal court." Counsel for complainants insist, however, that the prohibition of the statute should not apply in a case like this where the bank has ceased to do business and no longer exercises its function as a fiscal agent, or governmental agency of the United States; where, as stated by the comptroller of the currency, "the sole controversy is between the shareholders and the directors." They contend, therefore, that unless the Circuit Court has power to enjoin the proposed settlement, then irreparable injury would be suffered by complainants without corresponding benefit to any one.

After careful consideration of the able arguments of counsel, and detailed examination of the authorities cited, we are persuaded that section 5242 of the Revised Statutes of the United States constitutes an

express and full prohibition against the injunction ordered in this case. The language of the Supreme Court of the United States in Pacific National Bank v. Mixter, 124 U. S. 721 (31 L. Ed. 567), is broad and comprehensive. The court, in commenting upon the statute, says: "It stands now as it did originally as the paramount law of the land that attachments shall not issue from state courts against national banks and writes into all state attachment laws an exception in favor of national banks. Since the Act of 1873 the attachment laws of the state must be read as if they contained a provision in express terms that they were not to apply to suits against a national bank." The court further said: "In our opinion the effect of the Act of Congress is to deny the state remedy altogether so far as suits against national banks are concerned, and in this way it operates as well on the courts of the United States as on those of the states. Although the provision was evidently made to secure an equality among the general creditors in the division of the proceeds or the property of an insolvent, its operation is by no means confined to cases of actual or contemplated insolvency. The remedy is taken away altogether and cannot be issued under any circumstances. It was further said that if the power of issuing attachments has been taken away from the state courts, so also is the power of issuing injunctions. That is true."

The only case cited, or which we have been able to find, in which an attachment or preliminary injunction against a national bank has been sustained, is the case of Norris v. Merchants' National Bank of Deadwood, 30 Ill. App. 54. In this case the court, while recognizing the inhibition of the Federal Statute in cases of attachments and injunctions, held that the provision of the statute created a privilege to the defendant which might be, and in that case had been, waived by it. However, in the subsequent case of McDonald v.

First National Bank of Marquette, 41 Ill. App. 368, this court held that an attachment issued by a state court in aid of an action on the case brought in such court against a national bank would not lie. Mr. Justice Gary, who also rendered the opinion in the Norris case, *supra,* reviewed the law upon the subject to some extent, and held that under the comprehensive language of the Supreme Court of the United States in Pacific National Bank v. Mixter, *supra,* there was no longer any question that the statute was prohibitory.

Without passing upon the question as to whether the prohibition in the Federal Statute, above referred to, is merely a privilege which might be waived by the defendant, we are compelled to hold in this case that the statute constitutes an unqualified prohibition against the injunction originally issued. The motion for its dissolution should have been granted.

The second paragraph of the order of December 20, 1910, which we are considering, overruled the application of the defendants to have the injunction bond increased from $1,000 to $175,000. We do not regard this action of the court below as being subject to review upon this appeal, and, in any event, from the view we take of the case, it is of no special consequence.

In the third paragraph of the order of December 20, 1910, the court below modified the injunctional order of November 21, 1910, by striking out of the second line of the order in part of said injunction the words "The Chicago National Bank," so that, according to the terms of the order thus modified, the provision of the order then was, "said injunction shall run only against the defendants who are directors and all the officers, directors and stockholders of The Chicago National Bank, and each person claiming to be a proxy for any stockholders."

It seems probable that the court below considered

that the injunction of November 21, 1910, was im-
provident, and erroneous in including The Chicago
National Bank. If the chancellor was of that opinion,
he should have sustained the motion of defendants
and dissolved the injunction, instead of denying it, as
was done in the first paragraph of the order com-
plained of. The parties would then have been before
the court, and the complainants free to apply for a
new injunction if they so desired.

In legal contemplation, the court's order of Decem-
ber 20, 1910 (excluding the first two paragraphs), was
to incorporate in its injunctional order of that date
the language of the injunction granted on November
21, 1910, except that there was eliminated only The
Chicago National Bank. This injunctional order of
December 20, 1910, running as it did against all the
directors, officers and stockholders of the bank, is
clearly, in effect, an injunction against the corpora-
tion itself; West Side Hospital v. Steele, 124 Ill. App.
534; Jackson v. Hooper, 75 Atl. 568; Stockton v. Amer-
ican Tobacco Co., 55 N. J. Eq. 352; and was, therefore,
erroneous.

In passing, we notice that paragraph 7 of the order
of December 20, 1910, appears to have been entered
"upon motion of several of the stockholders of The
Chicago National Bank, not parties to this suit," and
we are at loss to understand how the court could act
upon the initiative of persons not parties to the pro-
ceedings. In its result, it is probably unimportant,
however, because the paragraph provides, in effect,
that nothing in that order nor in the preceding one
of November 21, 1910, as modified, should prevent
any stockholder of the bank from making any indi-
vidual compromise or settlement with Billings of any
claim or demand of such stockholder against him on
account of this alleged liability as a former director
of the bank, or from assigning any claim which he
may have had against Billings on account of such

alleged liability; or from assigning any right, title or interest, claim or demand of such stockholder to his distributive share of any amount which may be recovered by a receiver against Billings on account of such alleged liability, provided that no such compromise, settlement, assignment or other action of any such stockholder shall in any wise affect any right, claim, demand, cause or right of action of the complainants or of the receiver or any other stockholder. As we understand it, the cause of action in this case is that of the bank as an entity against Billings, and so every stockholder would have the right to do as he chose with any individual claim or cause of action which he might have against Billings.

Having held that the court erred in not dissolving the injunctions granted in the orders of November 21, 1910, and December 20, 1910, respectively, we come to the important question as to the jurisdiction of the court to proceed in the case and to appoint a receiver.

The Chicago National Bank was a creature of the national banking laws, and it would seem appropriate that its affairs be administered in the Federal courts. In this case, however, the complainants, because of lack of requisite citizenship, cannot invoke the aid of those courts. The existence of national banks, as bodies corporate, can be sustained under the U. S. constitution only, because they may be employed by the government in the exercise of its functions. The bank is no longer an agent of the United States engaged in discharging the functions for which it was created. For more than five years it has not been engaged in the banking business, and there must be some forum in which its assets can be collected and distributed among those entitled to share. Application was duly made to the comptroller of the currency, and by letter of December 5, 1910, he declined to interfere, stating that ''as the bank has ceased to

do business,—as no creditor is complaining, and every creditor, so far as known, has been paid in full,—it is evident that the sole controversy is between the shareholders and the directors, involving their respective rights,'' and he further expressly stated that none of the provisions of the statutes of the United States gave him any power or jurisdiction to appoint a receiver.

For several years before the suspension of The Chicago National Bank it appeared to be prosperous, and large dividends were being paid. Its stock was eagerly sought, and some of it purchased in the open market by complainants for as much as $350 to $400 per share. The misuse of the funds of the bank by Mr. Walsh caused a condition which compelled the suspension of the bank. Partly for their own protection, and partly to sustain confidence in banking institutions, the associated banks of Chicago took over all the assets of this bank and paid all its debts. After payment of its debts certain uncollected assets were returned to the bank, so that the value of the present assets of the bank belonging to the stockholders, and available for distribution among them, other than the unenforced claim against Billings, probably does not exceed $300,000, and may be very much less.

The bank being no longer a going concern, and there being no creditors, all that remains is for the stockholders to have its assets secured and distributed equitably among those entitled. In a sense the stockholders now occupy the relation toward each other of partners. With reference to the matters now in controversy, they are not now acting in any corporate capacity. It cannot be that, because the complainants may not invoke the jurisdiction of the Federal courts. they are, therefore, without any remedy.

Under the national banking laws, upon vote of two-thirds of the shareholders, the bank might be placed in liquidation and an agent appointed for the collec-

tion and distribution of its assets. So far as we can discover, no specific statutory provision exists for meeting the situation presented in this case. But it can hardly be supposed that the omission in the statutes to provide an express and specific course of proceeding, by way of judicial remedy, in cases of voluntary liquidation, left either the creditors of such an association, or its stockholders, in such circumstances, without remedy against the results of a partisan or fraudulent mal-administration.

The case of Cogswell v. Second National Bank, 76 Conn. 252, is cited by both appellants and appellees as supporting their respective contentions. A careful examination of the case makes it of doubtful authority for either side. Nevertheless, the opinion of that able court constitutes a material contribution to the law on the subjects under discussion there and here. In that case the court says, beginning on page 254: ''That a national banking association derives its franchise from the United States does not exempt it from subjection to such State laws as do not impair its efficiency in performing those functions by which it was designed to serve the United States, nor trench upon a field occupied by Congressional legislation.'' National Bank v. Commonwealth, 9 Wall. 353, 362; Davis v. Elmira Savings Bank, 161 U. S. 275, 283, 287; Easton v. Iowa, 188 *id.* 220, 238. * * * ''For winding-up proceedings, in case of insolvency or certain other defaults on the part of the corporation, Congress has made special provision by means of a receiver appointed under authority of the United States. * * * These statutes were not designed to exclude proceedings within the ordinary jurisdiction of courts of equity, to enforce rights of a solvent national bank against those who have mismanaged or are mismanaging its affairs.'' Citing Richmond v. Irons, 121 U. S. 27, 48.

In the Cogswell case the suit was brought by a

stockholder against the Second National Bank of Norwich, and the bank was the sole defendant. It was charged that the bank was not acting in good faith with respect to certain assets equitably belonging to it, and generally that the bank was wrongfully appropriating or wasting its property; that the bank's charter had expired, and that the bank only existed for the purposes of liquidation. The prayer for relief was that a receiver might be appointed, "with power to wind-up its affairs under the eye of this court, and to collect the assets of said defendant bank that were charged off as aforesaid; and pay them to such as are entitled to receive them." A temporary receiver had been appointed, who died shortly after qualifying, and a new receiver had been appointed.

Objection was made to the legality of the appointment of any receiver by the state courts because of the supposed prohibition of section 5242 of the U. S. Statutes, the defendant claiming that the appointment "of a receiver would operate as an equitable execution, and be tantamount to an injunction touching the disposition of the property." The decretal part of the order appointing Sperry receiver as successor to the deceased receiver, specified that he was to fill the vacancy as temporary receiver of the bank, and the assets and property, and of the particular assets referred to in the complaint, until further order of the court, with full power and authority to take possession of the property, affairs and assets of the corporation and wind-up its affairs under the direction of the court. The order further provided that he should furnish a bond, and that thereupon he should take possession of the property and proceed under the direction of the court with the winding-up of the affairs of the banking association, and the collection of its special assets until the further order of the court in the premises, and direct that the officers and liquidating committee of the bank deliver to him all the prop-

erty in the order referred to. It appeared that the
original order appointing the original receiver was
made on May 5th, and contained directions to him to
take possession of the assets, etc., and that order
superseded the power of the directors to proceed with
the liquidation of the affairs of the bank, as effectually
as if they had been in terms enjoined against so
doing. Bank of Bethel v. Pahquioque Bank, 14 Wal-
lace 383, 400.

*Without deciding whether the objection urged
against the appointment of the first receiver was valid,*
the court held that even if it were erroneous, because
in violation of the Act of Congress, the order appoint-
ing the second receiver was not open to that objec-
tion, because it deprived the defendant bank "of the
possession of nothing, for it then held nothing in its
possession. It sequestered no assets in favor of any
particular creditor; for the plaintiff, though suing
alone, in effect sued for the benefit of all those sim-
ilarly interested in the funds, and of all creditors who
might come in and show a right to share in any of the
assets held by the receiver." Richmond v. Irons, 121
U. S. 27, 44. In its opinion the court further stated:
"The fifth objection was that the Superior Court had
no power to appoint a receiver to wind-up a national
bank, at the instance of a stockholder. This is true
so far as concerns such causes of action as are by
Act of Congress made the foundation of winding-up
proceedings to be brought under the authority of the
United States. For other causes of action Congress
has left the State courts free to grant relief of that
nature whenever the general rules of equity may be
deemed to call for it." Citing Merchants & Planters
National Bank v. Trustees, 63 Ga. 549; 65 *id*. 603;
Elwood v. First National Bank, 41 Kan. 475. *  *  *
"The bank was no longer a going concern. It was
kept in life only that its affairs might be wound-up,
and he stated a case which sufficiently justified him in

seeking to have it wound-up, and a special trust fund administered by others than those who were found in control.'' The court further stated that the claim for relief in that case was in effect threefold: First, that the fund set apart for the benefit of plaintiff and other original stockholders be recovered and duly applied. Second, that the affairs of the defendant be wound-up under the direction of the court, instead of that of those who had gained the control of it, and were using their power for improper purposes. And, third, that a receiver be appointed to accomplish these ends. If the appointment as made operated as an execution, attachment or injunction, within the meaning of the U. S. Rev. Stat. 5242, it was not in violation of that section, since not made before but as a part of the final judgment in the cause. Final because the defendants demurred to the complaint, and also to the petition for the appointment of receiver, and the defendants refused to plead over, hence a judgment against them, the complaint having been held sufficient.

Elwood v. The First National Bank of Greenleaf, 41 Kansas 475, was a suit brought by a stockholder against a national bank for the purpose of having a receiver appointed to take charge of its affairs, and for other purposes. On the 18th of October, 1888, a receiver was appointed, the service of summons on the president not being made until the next day. A month later it moved to set aside the motion appointing a receiver, which was granted. The plaintiff brought the cause to the Supreme Court on a writ of error; it appearing at the time of the commencement of the action the bank, by the consent of all the officers, was in process of voluntary liquidation, the president having charge and management thereof. The bill alleged that the bank had been grossly mismanaged by its officers, and that they and its managing agents were fraudulently squandering its assets. A tempo-

rary receiver was appointed, but this appointment was afterwards set aside and the receiver discharged. It was claimed that before a receiver should be appointed it should appear that the plaintiff had a probable cause of action, and this contention the court sustained. It was contended that there was a lack of parties defendant, because the officers and stockholders were not made parties. The court suggested the propriety of having them brought in before final hearing, but held it was not requisite that they be before the court at the time of the appointment of the receiver, because the bank itself was so largely representative of the other interests. The court said: "It is clear that the affairs of the bank in the present case should be in the hands of a receiver. The bank is clearly insolvent; its affairs have been very badly mismanaged. * * * Exact justice can be done only by a receiver who will not favor one creditor or stockholder more than another."

For several reasons, it seems clear to us that the situation disclosed by this record calls for the intervention of a court of equity. Complainants assert that the Bank has a valid and legitimate claim against Billings for the injury caused to it by his negligence and inattention to its affairs. The amount of such liability, if any, is variously estimated at from $300,000 to $3,500,000. His alleged liability is based upon his having so far neglected his duty as a director of the bank as to permit Walsh to use its funds in an unlawful and unauthorized manner, by reason of which large losses were sustained by the bank and, through it, by these stockholders. It is averred that these losses would not have occurred if Billings had discharged the duty he owed as a director to the Bank and these shareholders, because if he had faithfully met and discharged his obligations as such director, Walsh would not have been permitted to use the funds in the manner complained of, and the resulting loss to the Bank would not have occurred.

If it is true that the Bank sustained large losses through the misuse of its funds by Walsh, and that Billings is liable therefor because he failed to prevent such use of the funds of the bank by Walsh, then it would seem to follow that his associates, who were co-directors with him, were also at fault in a greater or less degree. To their credit, it should be said, that all the directors, except Billings, have, since the suspension of the bank, stood loyally by, and with their utmost endeavors, and by large contributions of money, aggregating more than $600,000 in cash, have tried to minimize the loss, and insure the payment of all the debts of the bank.

The hostile feeling toward the defendant Billings, which is evident in this record, appears in large part to be due to the fact that, until recently, he appeared entirely indifferent to the sad financial situation, and for its relief he does not appear to have made any contribution of effort, time or money, while his associates have given generously of all three.

If any funds should be realized to the bank from Billings, either by the acceptance of his offer of $152,125, or as a result of the litigation against him, there must come a time of distribution of these funds among those to whom it equitably belongs. We think it appears from this record that Billings' offer was made upon the expectation that it would be distributed among such owners of the shares of stock of the bank as were not co-directors with him. Indeed, several of the directors testified that they did not expect, nor desire, to receive any portion of such proceeds. On the other hand, persons holding, as collateral security, certificates for a large number of shares of stock owned at and prior to the time of the suspension by such co-directors, and pledged as security for loans (including in this number some stock belonging to and pledged by Walsh), contend that they are entitled to share in the proceeds derived from the claim against

Billings. Somewhere, sometime, and in some forum, the question as to who is entitled to participate in this fund must be determined, and we feel clear that in a court of equity, and there only, could this determination be adequately made.

If, as has been suggested, this fund is to be distributed among stockholders, other than those who were directors at and prior to the time the bank suspended, as most or all of the defendant directors seem to concede should be done, it would seem that such directors and stockholders as are not to share in the proceeds should not be allowed to determine the question as to how much should be received from Billings, nor in what manner the claim against him should be treated.

As we cannot see any adequate method of adjusting these questions and determining the equities of the respective parties, except in a court of equity, we think it appropriate, indeed necessary, that there should be a receiver appointed of the Billings claim, he to proceed in the matter of its enforcement, and the distribution of its proceeds, under the direction of a court of chancery.

In reaching this conclusion we are not assuming that the defendant directors will, in their capacity as such, nor, in their relations as stockholders, either through themselves or through their relatives or friends, consciously attempt in any manner to injure the complainants and other stockholders. We do not think, however, that they should be relieved from any imputation or suggestion of improper motive or action in the premises, and this will be accomplished by treating this claim as a fund, to be reduced to possession, and distributed by the court, through the instrumentality as an impartial receiver.

Such receiver should be required to make a full report and recommendation concerning the proposition of Billings, and upon such report the court should

hear all parties interested. It may be that Billings' offer should be accepted; that, as a business proposition, the money offered is of more value than would be the alleged claim against him with all its uncertainties. We cannot doubt that, in its action upon the report and recommendations of its receiver, the court would seek and be influenced by the judgment of the defendant directors, who are men of deservedly high standing, and whose attitude and action, in the main, appear to have been unselfish.

From the foregoing it appears that we are of the opinion that the injunction should not have been issued, but that, under the peculiar circumstances shown and because of the lack or entire inadequacy of any other remedy left open to the complainants, we think the court properly sustained jurisdiction of the suit and appointed a receiver of the claim against Billings.

That part of the order granting the injunction is reversed, and that part appointing a receiver is affirmed.

*Reversed in part and affirmed in part.*