Argued November 20; modified December 31, 1935; rehearing denied February 18, 1936.

## *GIESY ET AL. *v.* AMERICAN NATIONAL BANK OF PORTLAND ET AL.

(53 P. (2d) 20)

* On appeal to the United States Supreme Court.

*John C. Veatch* and *John M. Pipes,* both of Portland (Joseph, Haney & Veatch, John M. Pipes, and Pendergrass, Roehr & Zollinger, all of Portland, on the brief), for appellants.

*John R. Latourette,* of Portland (Latourette & Latourette, of Portland, on the brief), for respondents.

BAILEY, J. The question involved in this litigation is whether the First National Bank of Portland, Oregon, is liable to the plaintiffs, Ida H. Giesy and Ida Church Giesy and Paul C. Giesy, executors of the estate of Andrew J. Giesy, deceased, for rent of, and taxes and assessments against, certain real property situated in Portland, Oregon, accruing subsequent to June 20, 1933, for which the American National Bank of Portland, Oregon, was on that date primarily liable, by reason of the transfer by the American National Bank on said date, when it was insolvent, of all or practically all its assets to the First National Bank.

On June 20, 1933, the American National Bank and the First National Bank entered into an agreement whereby the American National Bank transferred and delivered to the First National Bank assets of the American National Bank amounting to $4,743,806.72 in consideration for the First National Bank's assuming all liabilities of the American National Bank, with the exception of the latter bank's liability, either actual or contingent, on a certain agreement of leasing which will hereinafter be referred to more specifically.

The assets so transferred consisted of cash, bonds, notes receivable, furniture, fixtures, stock of the Ameri-

can Safe Deposit Company, shares of stock in the Federal Reserve Bank, warrants and other items, all having a total estimated value in the above amount. A cash item of $1,619,506.48 included in the assets which the American National Bank agreed to transfer to the First National Bank necessitated the former bank's, supplying in addition to the money it then had on hand the sum of $804,344.45. This additional sum was raised by the bank by disposing of its assets other than those agreed to be turned over to the First National Bank and which had been rejected by that bank. Assets forming this group were, according to the resolutions of the board of directors of the American National Bank, not here questioned, of much less value than the sum of $804,344.45 paid for them by a Portland man and his associates interested in having the First National Bank assume the then existing liabilities of the American National Bank. The obligations so assumed by the First National Bank, consisting principally of liability to depositors of the American National Bank, aggregated the entire estimated value of the assets transferred to the former bank.

The same individuals who paid $804,334.45 for the assets rejected by the First National Bank guaranteed the payment of notes of the American National Bank transferred to the First National Bank in the aggregate amount of $275,773.42 and also guaranteed to save the First National Bank harmless from liability as to any sum due or thereafter to become due and from any and all liability on the lease hereinafter referred to in detail.

This agreement between the American National Bank and the First National Bank was approved by the comptroller of the currency of the United States before the parties thereto executed it. The assets were

transferred, as agreed, and the First National Bank assumed all the liabilities of the American National Bank existing on June 20, 1933, with the exception of that which might arise by virtue of the lease.

The lease mentioned was entered into on March 17, 1923, by and between Andrew J. Giesy and Ida H. Giesy, his wife, as lessors, and the Broadway Bank, a corporation existing under the laws of the state of Oregon, as lessee, for certain property situated in the city of Portland, Oregon, for a term of 30 years, with a rental reserved of $450 a month for the first five years, thereafter to be periodically increased. In addition to the payment of rentals reserved, the lessee agreed to pay all taxes and assessments against said real property during the term of the lease and also to erect on the real property a building costing not less than $30,000 and at least two stories in height.

The lessee entered into possession of the property, erected its building and thereafter, in February, 1929, when the lessee in the meantime had become a national institution known as Portland National Bank, it consolidated with another national bank which later became the American National Bank. In that consolidation it transferred all its rights in and to the lease to the American National Bank. Under date of March 29, 1932, the American National Bank transferred and assigned the lease to the Pacific Bancorporation, which latter concern on the following day transferred and assigned the same to the Capital Underwriters Corporation. About this same time the lessors, in consideration of the American National Bank's guaranteeing the payment of the rents reserved in the lease and the fulfilment of all and each of the terms and conditions therein set forth, ratified and confirmed the various assignments hereinbefore mentioned.

At the time when the agreement between the American National Bank and the First National Bank was signed, to wit, June 20, 1933, the monthly rental for June had been paid, and for three months thereafter such rent was paid by the Capital Underwriters Corporation, which during such time was, and still is, in possession of the premises. There was, however, on June 20, 1933, remaining unpaid, under the terms of the lease, the sum of $8,043.38, which represented unpaid taxes and street assessments against the property, with interest on the same.

In November, 1933, the plaintiffs instituted an action in the circuit court for Multnomah county, against the American National Bank, Pacific Bancorporation, Capital Underwriters Corporation and Union States Building Corporation, to collect the unpaid taxes and city liens hereinbefore mentioned and rent for the months of October and November, 1933. On December 13 of that year a judgment was entered in that court in favor of the plaintiffs for the sum of $10,163.54, which included rental for the months of October and November. Execution was thereafter issued on the judgment and returned by the sheriff *nulla bona.*

On February 14, 1934, this proceeding was instituted in the nature of a creditors' suit against the American National Bank and the First National Bank, both of Portland, Oregon, to recover the amount of the judgment rendered in the former action, with interest thereon, for $1,000 as rental for the months of December, 1933, and January, 1934, and for reasonable attorneys' fees as provided in the contract of leasing. The trial resulted in entry of judgment in favor of plaintiffs and against the American National Bank for the sum of $1,000 as rent for December, 1933, and January, 1934, with interest thereon, and attorneys'

fees. The judgment referred to that of $10,163.54 rendered against said bank and others in December, 1933, and decreed that the plaintiffs recover from the First National Bank the amount of the previous judgment, with interest, and the amount of the judgment herein entered against the American National Bank, on the ground that the First National Bank had "commingled with its own assets all the assets of the defendant, American National Bank". From the judgment and decree so entered, both defendants have appealed.

It is the plaintiffs' contention that since the American National Bank was insolvent on June 20, 1933, when it conveyed its assets to the First National Bank, such transfer was null and void; that the plaintiffs had a right to follow such assets, if the same could be ascertained, and impress upon them a lien for the entire amount which the American National Bank had obligated itself to pay under the lease hereinbefore described; and that, if such assets after passing into the hands of the First National Bank had been merged with and become a part of the general assets of the latter bank so that they could not be segregated therefrom, plaintiffs would be entitled to judgment against the First National Bank for the amounts found due them under the lease, not exceeding, however, the value of the assets transferred to that bank by the American National Bank. In support of this argument the plaintiffs rely upon §§ 5242 and 5236, R. S. [U. S. C. A., tit. 12, §§ 91 and 194], which statutes respectively read as follows:

"All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judg-

ments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any state, county, or municipal court. (R. S. § 5242.)''

''From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held. (R. S. § 5236.)''

Although the comptroller of the currency approved and authorized the transfer of assets of the American National Bank to the First National Bank, he did not take charge of the assets of the former bank and appoint a receiver to proceed with its liquidation. All that could have been done by such a receiver toward payment of the claims of all creditors of the American National Bank, with the exception of the plaintiffs, was done and performed by the First National Bank.

In the case of *First National Bank v. Colby*, 21 Wall. 609 (22 L. Ed. 687), the court, after referring to various sections of the banking law, observed:

"There is in these provisions a clear manifestation of a design on the part of Congress: 1, to secure the government for the payment of the notes, not only by requiring in advance of their issue a deposit of bonds of the United States, but by giving to the government a first lien for any deficiency that may arise on all the assets subsequently acquired by the insolvent bank; and, 2, to secure the assets of the bank for ratable distribution among its general creditors.

"This design would be defeated if a preference in the application of the assets could be obtained by adversary proceedings. The priority of the United States and the ratable distribution among the general creditors, so studiously provided for in the act, would in that case be lost. As justly observed by counsel, if preference was left to the race of diligence, creditors living remote from the location of the bank would always be distanced in the contest, and the equality promised to them by the act would be a mere mockery."

Section 5242, R. S., as originally enacted (13 Stat. 115) did not contain the present last clause relating to the issuance of attachments, injunctions and execution before final judgment. This provision was evidently added "to secure equality among the general creditors in the division of the proceeds of the property of an insolvent bank". Nevertheless, "its operation is by no means confined to cases of actual or contemplated insolvency". See, in this connection, *Pacific National Bank v. Mixter*, 124 U. S. 721 (8 S. Ct. 718, 31 L. Ed. 567), and cases cited in note to U. S. C. A., tit. 12, § 91.

The respondents correctly state the law when they say that, "The national banking act and the construction placed thereon by the federal supreme court are reiterations of the equitable doctrine that the assets

of a failing corporation are to be considered as trust funds for the benefit of all creditors.''

On June 20, 1933, when the assets of the American National Bank were transferred to the First National Bank, the former bank was insolvent. At that time the plaintiffs were entitled to share in those assets proportionately with the other general creditors of the American National Bank. The record in this case discloses that the assets which the American National Bank owned before the consummation of its negotiations with the First National Bank were insufficient to pay in full its creditors other than the plaintiffs. In order to secure payment to such creditors it was necessary for the American National Bank to obtain funds in excess of $800,000 by the method hereinbefore outlined, and to procure the guaranty of payment of certain obligations owed to the bank.

Had the creditors taken possession of the assets of the American National Bank and proceeded to wind up its affairs, undoubtedly not any of them would have received anything like the amount of their claims. In an involuntary liquidation there would have been a great sacrifice in reducing the bank's assets to money, accompanied by the added expense and delay incident to such a proceeding. The position in which plaintiffs would have found themselves, had the comptroller taken charge of the assets of the American National Bank, is explained in their brief as follows:

''The national banking act provides a method for the liquidation of an insolvent national bank by the appointment of a receiver by the comptroller of currency or by the appointment by the bank of a voluntary liquidator. In such cases claims are to be filed, assets liquidated and the proceeds distributed ratably. Where the legal method of liquidation is adopted the law requires that all claims be liquidated as of the date of

insolvency, so that the creditors may receive their *pro rata* shares without protracted delays. In such a case where there is an outstanding lease, the lessor must reduce his claim to a definite sum, his measure of damages ordinarily being a sum equal to the difference between the rentals payable under the lease for the unexpired terms and the rental value as of the date of insolvency.''

The contention of the plaintiffs is further explained by the following statement in their brief:

''That the lessor of an unexpired lease is a creditor entitled to prove his claim with the comptroller in a legal liquidation appears clear from a reading of the act and has been settled in Chemical National Bank v. Hartford Deposit Co., supra, [161 U. S. 1] in which case the federal supreme court affirmed a judgment of the court of appeals of Illinois, allowing lessors' claim against the receiver of an insolvent national bank for full damages for failure to carry on the lease.

''Had the American National Bank pursued the legal method of liquidation, there can be no doubt under the decision of the Chemical National Bank case respondents would have been entitled to participate in the assets to the extent of such damages as they may have been able to prove for breach of the lease. Being creditors in a legal liquidation, their character as creditors can not be destroyed by an illegal transfer of assets.''

The respondents in this case are not attempting to impress a lien on the assets of the American National Bank transferred to the First National Bank ''to the extent of such damages as they may have been able to prove for breach of the lease''. No effort has been made by them to liquidate their damages for the failure of the American National Bank to carry out the terms of the lease. They acknowledge that they had a right either to terminate the lease and sue for damages or to

treat it as in full force and sue for rentals accruing under it; that the remedies available to them could not be pursued simultaneously; and that the election of one was the rejection of the other.

■ Although the respondents may have had an election at the time of the transfer of these assets to the First National Bank either to terminate the lease or keep it alive, they did not have a right to look to the assets held by the American National Bank prior to such transfer, after the latter bank's insolvency, for any more than their pro rata share of such assets for damages which they had suffered by breach of the lease by the American National Bank. They did not have a right to look to those assets for the entire amount agreed to be paid during the unexpired term of the lease.

The respondents elected to keep the lease in full force and effect. They collected the rents on the property for three months after the transfer of its assets by the American National Bank. Then when the rents were in default for two months they obtained judgment therefor against four defendants. Execution on such judgment proved futile, but the respondents even then did not seek to recover damages for breach by the lessee and its assignees.

We are not here deciding that when rents are fully paid at the time a bank becomes insolvent its lessor is entitled to enforce any claim whatever against the assets of the bank. There would seem to be an intimation in the case of *Fidelity Safe Deposit & Trust Co. v. Armstrong*, 35 Fed. 567, that a lessor under such circumstances was not a creditor or entitled to enforce any claim against the assets of the bank. We are here merely considering the rights of the respondents in the light most favorable to them.

It is inconceivable why the respondents should contend that after the assets of the American National Bank were transferred to the First National Bank they could look to all the assets so transferred for payment of future rentals as they might mature, and at the same time concede that those assets while in the possession of the American National Bank after that bank became insolvent were a trust fund to be applied *pro rata* to the claims of the general creditors of that bank. In order to hold the First National Bank at all, it would be necessary to construe the federal acts as they have uniformly been construed, declare that the transfer by the American National Bank was null and void and treat the assets attempted to be transferred as still the property of the American National Bank. Under such a construction, if such assets are to be treated as still belonging to the American National Bank, then it follows that the respondents can have no greater claim against them than if no attempt to transfer them had been made.

██ In regard to the liquidation of national banks the federal banking laws are paramount. Neither state legislation nor decisions can in any way take from or add to the force of the national banking laws. Attempts by state legislation to give preference to certain depositors of national banks over others are null and void. State laws and decisions allowing attachments and injunctions in other proceedings are not available in the instance of claims against national banks: *Davis v. Elmira Savings Bank,* 161 U. S. 275 (16 S. Ct. 502, 40 L. Ed. 700) ; *Merrill v. National Bank,* 173 U. S. 131 (19 S. Ct. 360, 43 L. Ed. 640). Under the construction which has been given by the federal courts to the United States banking laws, preferences are not to be permitted to creditors of insolvent banks; and

therefore the preferred lien which is sometimes allowed to a plaintiff in a creditor's suit to recover assets fraudulently transferred is not applicable to cases growing out of insolvency of national banks, if it results in permitting one creditor to acquire a preference over another or in preventing a ratable distribution of the assets to all creditors.

It was conceded by the appellants on final argument that the respondents were entitled to recover against the First National Bank the sum of $8,043.38, the amount due them on the date of the transfer by the American National Bank of its assets to the First National Bank. It is, however, contended by the appellants that the respondents are not entitled to interest thereon subsequent to the date when the transfer was made or the date fixed as the time when it was admitted that the American National Bank was insolvent. In this we think the appellants are in error, for the reason that the other creditors' claims were at that time paid or provided for, and the respondents should therefore recover interest on the items included in said amount until paid. This sum of $8,043.38, however, constituted the entire amount due the respondents from the American National Bank at the date of its insolvency, and since the respondents have not elected to treat the agreement of leasing as at an end and liquidate their damages they are not entitled to recover anything additional against the assets of the American National Bank which that bank owned at the time of becoming insolvent, or against the First National Bank by reason of the transfer of those assets, with the exception of a reasonable attorneys' fee.

The lease agreement provided that the lessors were entitled to reasonable attorneys' fees in the event that they were obliged to resort to court proceedings to en-

force the provisions of the lease. They were compelled to go into court to enforce the payment of the above amount. The circuit court allowed the respondents the sum of $750 in the original suit brought by them against the American National Bank and others. We consider that amount reasonable, and the respondents should recover the same against the First National Bank.

No case has been cited, nor have we been able to find any, based on the national banking act, which would uphold the judgment in this case rendered against the First National Bank. Nor has any case been cited, or found by us, construing the national banking act, which holds that a lessor can recover in full the future rents provided for in the lease, out of the assets of an insolvent bank, whether those assets have been administered as provided by the banking act or otherwise. The case principally relied upon by the respondents in this connection is *Williams v. Commercial National Bank*, 49 Or. 492 (90 P. 1012, 91 P. 443, 11 L. R. A. (N. S.) 857), which, however, is not based on the national banking act, nor are the facts therein comparable to those in the case before us.

In *Wannamaker v. Edisto National Bank*, 62 Fed. (2d) 696, the circuit court of appeals for the fourth circuit, in a suit brought by certain stockholders to enjoin a stockholders' liability assessment, after referring to § 5220 R. S. (U. S. C. A., tit. 12, § 181), which relates to the voluntary liquidation of a bank, said:

"These provisions, however, are designed to govern the actions of a board of directors in conducting the affairs of a solvent going concern, and not to render the board powerless to act so as to safeguard the assets when the corporation is insolvent or in imminent danger of becoming so. We agree with the conclusions

of the eighth circuit in City National Bank of Huron v. Fuller (C. C. A.), 52 F. (2d) 870, 79 A. L. R. 71, where it was held that a transfer of assets, in consideration of an assumption of a liability, by one national bank on the verge of insolvency to another, was within the general authority of the board of the failing bank under R. S. § 5136 (7), 12 U. S. C. § 24 (7), 12 U. S. C. A. § 24 (7), to exercise all such incidental powers as should be necessary to carry on the business of banking. An emergency existed in the pending case, and hence the directors had the power to prevent the sacrifice of the assets and to transfer them to a going concern by which they could be reduced to money under more favorable conditions. See Wyman v. Wallace, 201 U. S. 230, 26 S. Ct. 495, 50 L. Ed. 738; Chase v. Hall (C. C. A.), 30 F. (2d) 195.''

Both the American National Bank and the First National Bank, in the transaction here involved, were acting in utmost good faith, in an attempt to protect depositors and creditors of the former bank. They did secure payment of such creditors in full, with the exception of respondents in this action. A serious question arose during the negotiations as to what, if any, liability attached to the First National Bank on this lease. The lessors knew of the negotiations and attempted to hold both the American National Bank and the First National Bank for all the rents reserved in the lease.

For a court of equity to hold, under facts as disclosed by the record in this case, that the lessors are entitled to recover from the First National Bank a much greater sum of money, estimated at more than $200,000, for the unexpired term of the lease, than they would be entitled to obtain had the assets of the American National Bank been taken over by the comptroller and administered by him, would be contrary

to the spirit of the federal banking act, and would place a premium on inaction in time of financial stress.

After the transfer of its assets to the First National Bank, the American National Bank continued as a corporation and could be dissolved only in the manner provided by law.

The judgment and decree appealed from will be affirmed as to the American National Bank and modified as to the First National Bank, in the respects hereinabove indicated. Neither the respondents nor the First National Bank shall recover costs as against each other.

BELT, KELLY and ROSSMAN, JJ., concur.

RAND, J. (dissenting). On June 20, 1933, the American National Bank of Portland, Oregon, was an insolvent banking association and its directors decided that it should go into voluntary liquidation and close out its business. To that end they authorized and directed its president and secretary to execute a written contract that had already been prepared, agreeing to transfer all its assets to the First National Bank of Portland, Oregon, in consideration of the promise by the latter to pay all its liabilities with the exception of plaintiffs' claim under a lease which had 19 years and 10 months yet to run and upon which there was then due and owing to plaintiffs the sum of $8,040.33.

The contract was entered into by the two banks and a transfer of all the assets of the insolvent bank was made in accordance with its terms, but it was expressly stated in the contract that the vendee bank would not assume and should not be obligated to pay either the moneys then due to the plaintiffs or any sums thereafter becoming due under the lease.

This action upon the part of the directors and officers of the insolvent bank was thereafter duly ratified by the shareholders owning two-thirds of the stock of the insolvent bank.

Subsequently plaintiffs brought an action against the American National Bank to recover said sum of $8,040.33 and for two months' additional rental that had accrued subsequently to the transfer, and recovered judgment for both of said sums. Thereupon they brought this proceeding in the nature of a creditor's bill against both of said banks to impress a lien for the amount of their said judgment upon the assets of the insolvent bank or their proceeds which were then in the hands of the First National Bank, and obtained a decree for the amount of their said judgment with interest and costs, and, from this decree, both of said banks have appealed.

The defendants contended in the court below that, because of said stipulation in the contract, there was no liability to plaintiffs for any sum upon the part of the vendee bank and this contention was made in defendants' opening brief upon this appeal, but, in their reply brief and upon the final argument here, defendants' counsel admitted that the vendee bank is liable for the amount which was due and owing to plaintiffs at the time the transfer was made but they deny that the vendee bank is liable to plaintiffs for any rental which has subsequently accrued under the lease. They base this contention upon the argument that, although the bank was insolvent and went into voluntary liquidation by vote of the shareholders owning two-thirds of its stock, the consequences resulting from such liquidation are no different from what they would have been had the liquidation been forced and a receiver appointed by the comptroller of the currency,

in which case, they say, the lease might have been terminated by the receiver and all liability for future rents thereunder avoided.

In support of this contention, they assert that they were entitled to go into voluntary liquidation under the provisions of section 181, Title 12, U. S. C. A. (Revised Stat., section 5220), which provides:

"Any association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock."

That section of the national banking act and the one next following provide for the voluntary dissolution of a national banking association but it was held in *Planten v. National Nassau Bank of New York,* 174 App. Div. 254 (160 N. Y. S. 297), that these provisions relate to a solvent bank and have no application to an insolvent bank, and this ruling was affirmed in *Planten v. Earl,* 220 N. Y. 677 (116 N. E. 1070). In the case first cited and referring to these particular provisions, the court said:

"* * * It is to be borne in mind that these statutory provisions relate to the dissolution of a solvent bank."

The same ruling was followed and applied in *City National Bank of Huron, S. D., v. Fuller,* 52 F. (2d) 870 (79 A. L. R. 71), where the circuit court of appeals for the eighth circuit, speaking through Circuit Judge Kenyon, said:

"We do not think section 181, title 12, U. S. C. A., has any application here, as there was no voluntary dissolution of the corporation we are dealing with, and said section is applicable only to a solvent bank."

Hence, the argument, so far as based upon the provisions of the statute above referred to, must fail since

all parties admit and the record shows that the American National Bank was insolvent at the time it transferred all its assets to the other bank in consideration of the latter's promise to pay all the insolvent bank's liabilities except the amount then owing to the plaintiffs, which, in itself alone, would, under the national banking act, create an unlawful preference of all other creditors over the plaintiffs.

Defendants also contend that when an insolvent bank goes into liquidation, whether voluntary or involuntary, the amount of its indebtedness must be determined as of the date of its insolvency and that this is a fixed and definite date on which all claims against the bank must be computed, and that this necessarily excludes future rents which may or may not become due under a lease, the term of which has not yet expired.

In *Merrill v. National Bank of Jacksonville,* 173 U. S. 131, 143 (19 S. Ct. 360, 43 L. Ed. 640), the court said:

"In Cook County National Bank v. United States, 107 U. S. 445, it was ruled that the statute furnishes a complete code for the distribution of the effects of an insolvent national bank; that its provisions are not to be departed from; and that the bankrupt law does not govern distribution thereunder. The question now before us was not treated as involved and was not decided, but the case is in harmony with Bank v. Colby, 21 Wall. 609, and Scott v. Armstrong, 146 U. S. 499, which proceed on the view that all rights, legal or equitable, existing at the time of the commission of the act of insolvency which led to the appointment of the receiver, other than those created by preference forbidden by section 5242, are preserved; and that no additional right can thereafter be created, either by voluntary or involuntary proceedings. The distribution is to be 'ratable' on the claims as proved or adjudicated, that is, on one rule of proportion applicable

to all alike. In order to be 'ratable' the claims must manifestly be estimated as of the same point of time, and that date has been adjudged to be the date of the declaration of insolvency.''

In *Schrader v. Manufacturers' Nat. Bank*, 133 U. S. 67 (10 S. Ct. 238, 33 L. Ed. 564), it was held that after a bank has gone into voluntary liquidation there is

"no authority on the part of officers of the bank to transact any business in the name of the bank so as to bind its shareholders, except that which is implied in the duty of liquidation, unless such authority had been expressly conferred by the shareholders. * * * the power of the president or other officer of the bank to bind it by transactions after it was put into liquidation is that which results by implication from the duty to wind up and close its affairs. That duty consists in the collection and reduction to money of the assets of the bank, and the payment of creditors equally and ratably so far as the assets prove sufficient. Payments, of course, may be made in the bills receivable and other assets of the bank in specie, and the title to such paper may be transferred by the president or cashier by an indorsement suitable to the purpose in the name of the bank; but such indorsement and use of the name of the bank is in liquidation and merely for the purpose of transferring title. It can have no other effect as against the shareholders by creating a new obligation. It does not constitute a liberty, contract or engagement of the bank for which they can be held to be individually responsible.''

Where a national bank goes into voluntary liquidation, its corporate existence is preserved for that purpose. This is well settled by all the authorities both federal and state. As said in *Planten v. National Nassau Bank*, supra,

"It is conceded and has been authoritatively decided that the adoption of a resolution for voluntary liquida-

tion does not effect a dissolution of the corporation but merely suspends its ordinary functions and that it continues in existence for the purpose of liquidating its affairs and that its directors are not ousted from office and that, at least in the absence of other action by the stockholders, the duty to liquidate the business devolves upon them.''

Under these authorities, the American National Bank continues to exist during the process of winding up its business and will continue to exist until its affairs are completely settled. One matter not yet settled is the claim now being sued on. It is not a new claim, as the obligations under the lease were created by the American National Bank before it became insolvent. Plaintiffs, therefore, were entitled to sue the American National Bank and to recover judgment for the rental which had accrued during the time that had elapsed after the making of the transfer and before the commencement of the action in the court below. The action was not an assertion 'of a new right or one which had been created by contract subsequent to the insolvency. In fact, the right depended upon no promise or agreement entered into by the insolvent bank after it had become insolvent. It was a continuing obligation and one which was in existence at the time of the transfer and will continue to exist until terminated in some lawful manner. There was nothing alleged or proved by which the right has been terminated or destroyed. The case, therefore, in respect to this claim for rental accruing subsequently to the making of the transfer is not to be determined by what might have resulted had there been an involuntary liquidation and a compliance with the national banking act. Hence, it is wholly immaterial whether, had there been a forced liquidation, the receiver would have had the option to determine

whether to continue or terminate the lease. No such option existed upon the part of either of the defendant banks. As to them, the lease is still in force and nothing has been done which has had the effect of terminating the lease or of discharging the insolvent bank from its obligation to pay the rent in accordance with the terms of the lease.

In so deciding, we assume the rule to be that if a national bank has paid rent for the premises occupied by it up to the time a receiver is appointed, the latter is not bound to take possession of them and pay rent; neither is the claim for rent during the unexpired term enforceable against the assets in his hands: *Fidelity Safe Deposit & Trust Co. v. Armstrong,* 35 Fed. 567. See also 3 Sutherland on Damages, section 850, but since no receiver has ever been appointed, we think the rule has no application in this case.

The defendants contend that, when the American National Bank had transferred all its assets to another bank and put it beyond its power to perform the lease, plaintiffs could then have declared a forfeiture of the lease and sued for the damages resulting to plaintiffs from an anticipatory breach for the remainder of the term. The rule invoked is that where a party bound by an executory contract repudiates his obligations or disables himself from performing before the time for performance has arrived, the promisee has the option to treat the contract as ended so far as further performance is concerned and maintain an action at once for the damages occasioned by such anticipatory breach.

The defendants cite numerous authorities in support of such rule but only one of the authorities cited

has any reference to the rights of a lessor as against a lessee bank. That case is *Minneapolis Baseball Co. v. City Bank,* 74 Minn. 908, where a state bank was involved and the decision was controlled not by the national banking act but by state statutes. A careful reading of the opinion will show that none of the holdings in that case have any application to the facts in this case. We have found no decision and, as stated, no case has been cited holding that the rule above referred to has any application to the breach of a lease by an insolvent lessee national bank. On the contrary, it was held in *Fidelity Safe Deposit & Trust Co. v. Armstrong,* supra, that, where a national bank had taken a lease for a long term and had soon afterward become insolvent and a receiver had been appointed, who refused to take possession of the leased premises, and the rent had been paid for the time the bank was in possession, the lessor was not entitled to damages out of the assets. In passing upon that question, the court said:

"Now, the second claim, 'by reason of the dissolution of the corporation,' that is not anything for which the receiver can be held liable; nor can he be held liable for the forfeiture of the charter of the Fidelity Bank, because both of these results are provided for by law, and must have been, in the eye of the law, in contemplation of the parties when the lease was made. These were contingencies which it was the duty of the lessor to take into account when he made his contract, and, if not satisfied to rely upon the bank itself, the only other course would have been to insist upon security for the performance of the conditions of the lease.

"As to the claim for damages by reason of the receiver—of the defendant—refusing to take under the contract and pay the rent, it is settled by all the authorities that the receiver was not bound to take possession. He had his election to take or not to take. If satisfied that the lease was valuable as an asset of the

bank, he might take possession, and, having taken possession, would be liable for the payment of the rent; but if satisfied that the lease was of no value, and that it would be of no interest to the trust—to the creditors,—he might refuse to take possession."

It was clearly established by the record in the instant case that the American National Bank at the time of the transfer was insolvent and that the transfer was made in contemplation of insolvency, and, as made, it resulted in creating an unlawful preference. Under those circumstances, it seems clear that these transactions were in direct violation of the provisions of section 91, title 12, U. S. C. A., which provides:

"All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceedings, in any state, county or municipal court."

That section not only contains a prohibition against the doing of the acts complained of here but also expressly declares that any transfer made in contemplation of insolvency or for the purpose of preferring one creditor over another shall be null and void. From this, it necessarily follows, the transfer being void, that these plaintiffs have the right to be placed in the

same position they would have been if the unlawful transfer had not been made: 6 Pomeroy's Equity, section 887. And since the First National Bank holds the transferred assets or the proceeds in trust for the creditors of the insolvent bank, it follows that plaintiffs, who are creditors of that bank, are entitled to have their claim paid from such assets or from the proceeds thereof.

The decree, therefore, should be affirmed.

CAMPBELL, C. J., and BEAN, J., concur.