# PACIFIC NATIONAL BANK *v.* MIXTER.

## SAME *v.* WHITNEY.

## SAME *v.* DEMMON.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF MASSACHUSETTS.

## BUTLER *v.* COLEMAN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF MASSACHUSETTS.

Argued January 9, 10, 11, 1888.— Decided February 20, 1888.

No attachment can issue from a Circuit Court of the United States, in an action against a national bank before final judgment in the cause; and if such an attachment is made on mesne process and is then dissolved by means of a bond with sureties conditioned to pay to plaintiff the judgment which he may recover, given in accordance with provisions of the law of the State in which the action is brought, the bond is void, and the sureties are under no liability to plaintiff.

The assets of a national bank having been illegally seized under a writ of attachment on mesne process, and a bond with sureties having been given to dissolve the attachment, which bond was invalid by reason of the illegality of the attachment, and the sureties having received into their possession assets of the bank to indemnify them against loss, and the bank having passed into the hands of a receiver appointed by the comptroller of the currency, a bill in equity may be maintained by the receiver to discharge the sureties and to compel them to transfer their collateral to him.

THE court stated the case as follows : —

All of these cases involved the same general question, and they may properly be considered and decided together. From the records it appeared that the Pacific National Bank of Boston was an association for carrying on the business of banking, organized under the national bank act. On the 20th of November, 1881, it became embarrassed, and was placed in charge of a bank examiner, in whose control it remained until March 18, 1882, when its doors were opened for business with the consent of the comptroller of the currency.

By statute, in Massachusetts civil actions are begun by original writ, which "may be framed either to attach the goods or estate of the defendant, and, for want thereof, to take his body; or it may be an original summons, with or without an order to attach the goods or estate." Mass. Pub. Stat. 1882, c. 161, §§ 13, 14. "All real and personal estate liable to be taken on execution . . . may be attached upon the original writ in any action in which debt or damages are recoverable, and may be held as security to satisfy such judgment as the plaintiff may recover." § 38. "A person or corporation whose goods or estate are attached on mesne process in a civil action may, at any time before final judgment, dissolve such attachment by giving bond with sufficient sureties, . . . with condition to pay to the plaintiff the amount, if any, that he may recover within thirty days after the final judgment in such action." § 122.

At the time the bank resumed business, it was indebted to George Mixter in the sum of $15,000; to Henry M. Whitney also in the sum of $15,000; to Daniel L. Demmon in the sum of $25,000; and to Calvin B. Prescott in the sum of $5000.

On the 24th of March, 1881, Mixter and Prescott each began a suit against the bank in the Circuit Court of the United States for the District of Massachusetts, by writ directing an attachment to recover the amounts due them respectively. Demmon also began a suit in the same court and in the same way on the 28th of March, to recover the amount due him, and Whitney another on the 28th of April, upon the claim in his favor. At the time these suits were begun, the bank had money on deposit to its credit in the Maverick National Bank and in the Howard National Bank, and the necessary steps were taken to subject these deposits to the attachments which were issued in the several suits.

The bank arranged with Lewis Coleman and John Shepard to become its sureties upon bonds to dissolve attachments in any actions that might be brought against it, and placed in their hands a certificate of deposit in the Maverick National Bank for $100,000, to be held as their protection against all liabilities which should be thus incurred. This certificate was

afterwards exchanged for $121,000 of the bonds of the Nantasket Company, $20,000 of the bonds of the Toledo, Delphos and Burlington Railroad Company, and $15,000 of the bonds of the Lebanon Springs Railroad Company.

Immediately after each of the attachments in the above actions had been made, the bank executed a bond to the plaintiff in a penal sum suited to the amount of the claim, with Coleman and Shepard as its sureties, reciting the attachment, and that the bank "desires to dissolve said attachment according to law," and conditioned to be void "if the Pacific National Bank of Boston shall, within thirty days after the final judgment in the aforesaid action, pay to the plaintiff therein named the amount, if any, which he shall recover in such action." Upon the execution of the bond in each case, the attachment was dissolved.

After this the bank closed its doors a second time, and on the 22d of May, 1882, a receiver was appointed by the comptroller of the currency in accordance with the provisions of § 5234 of the Revised Statutes, and at once took possession of its assets and proceeded to wind up its affairs.

When the receiver was appointed he found the several suits which had been commenced still pending. In the cases of Mixter, Whitney, and Demmon he appeared, answered for the bank, filed motions to discharge the attachments, and motions to dismiss the suits. His motions were all overruled, and, his defences not being sustained, judgments were rendered against the bank in each of the cases for the amounts found to be due the several plaintiffs respectively. For the review of the action of the court in these cases the writs of error which are now under consideration were brought.

The suit of Prescott still remains undisposed of in the Circuit Court.

Failing in his motions and in his defences at law, the receiver filed a bill in equity in the Circuit Court against the several attaching creditors, and the sureties on the bonds given to dissolve the attachments, the object of which was to reduce to his possession the securities which were held by the sureties for their protection against liability, and to restrain the several attaching

creditors from enforcing the attachment bonds on the ground among others "that the attachments made in said actions were unauthorized, illegal and void." This bill was dismissed by the Circuit Court, 22 Fed. Rep. 694, and from that decree the appeal which is now one of the subjects of consideration was taken.

*Mr. A. A. Ranney* for Butler, receiver.

*Mr. Joshua D. Ball* for Mixter.

*Mr. Alfred D. Foster* for Whitney.

*Mr. Richard Stone* for Coleman and Shepard.

*Mr. Henry Wheeler* for Demmon. *Mr. E. W. Hutchins* was with him on the brief.

Mr. Chief Justice Waite, after stating the case, delivered the opinion of the court.

In the view we take of the case, the most important question to be considered is whether an attachment can issue against a national bank before judgment in a suit begun in the Circuit Court of the United States. Section 5242 of the Revised Statutes of the United States contains this provision: "No attachment, injunction, or execution shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any state, county, or municipal court." The original national bank act contained nothing of this kind, but the prohibition first appeared in the act of March 3, 1873, 17 Stat. 603, c. 269, § 2, 13 Stat. 116, c. 106, as a new proviso added to § 57 of the act of June 3, 1864. That section was originally as follows:

"That suits, actions, and proceedings against any association under this act, may be had in any circuit, district, or territorial court of the United States held within the district in which such association may be established, or in any state, county, or municipal court in the county or city in which said association is located, having jurisdiction in similar cases: *Provided, how-*

*ever*, That all proceedings to enjoin the comptroller under this act shall be had in a circuit, district, or territorial court of the United States, held in the district in which the association is located."

The amending act was as follows:

" That section fifty-seven . . . be amended by adding thereto the following: ' *And provided further*, That no attachment, injunction, or execution shall be issued against such association, or its property, before final judgment in any such suit, action, or proceeding in any state, county, or municipal court.' "

Section 52 of the original national bank act was as follows:

" That all transfers of the notes, bonds, bills of exchange, and other evidences of debt owing to any association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, with a view to prevent the application of its assets in the manner prescribed by this act, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be null and void."   13 Stat. 115.

This was evidently intended to preserve to the United States that " first and paramount lien upon all the assets of such association" which was given by § 47 as security for the repayment of any amount expended by them to redeem the circulating notes, over and above the proceeds of the bonds pledged for that purpose, and to place all the other creditors on that equality in the distribution of the assets of an insolvent bank which was clearly provided for in § 50, where the comptroller of the currency is required to make ratable dividends of the proceeds of the assets of the association realized by the receiver " on all such claims as may have been proved to his satisfaction, or adjudicated in a court of competent jurisdiction." *National Bank* v. *Colby*, 21 Wall. 609, 613.

In the Revision of the Statutes § 52 of the original act, and the amendment of § 57 adopted in 1873, relating to attach-

ments and injunctions in state courts, were reënacted as § 5242, the amendment of § 57 being put in the revision at the end of what had been the original § 52. As the Revised Statutes were first adopted, the proviso of § 57, which related specially to proceedings to enjoin the comptroller, was reënacted as § 736, but all the rest of the original section was left out. That omission was, however, supplied by the act of February 18, 1875, 18 Stat. 316, 320, c. 80, which reënacted it as part of § 5198, putting it at the end of that section as it originally stood in the revision.

The fact that the amendment of 1873 in relation to attachments and injunctions in state courts was made a part of § 5242 shows the opinion of the revisers and of Congress that it was germane to the other provision incorporated in that section, and was intended as an aid to the enforcement of the principle of equality among the creditors of an insolvent bank. But however that may be, it is clear to our minds that, as it stood originally as part of § 57 after 1873, and as it stands now in the Revised Statutes, it operates as a prohibition upon all attachments against national banks under the authority of the state courts. That was evidently its purpose when first enacted, for then it was part of a section which, while providing for suits in the courts of the United States or of the State, as the plaintiff might elect, declared in express terms that if the suit was begun in a state court no attachment should issue until after judgment. The form of its reënactment in the Revised Statutes does not change its meaning in this particular. It stands now, as it did originally, as the paramount law of the land that attachments shall not issue from state courts against national banks, and writes into all state attachment laws an exception in favor of national banks. Since the act of 1873 all the attachment laws of the State must be read as if they contained a provision in express terms that they were not to apply to suits against a national bank.

The prohibition does not in express terms refer to attachments in suits begun in the Circuit Courts of the United States, but as by § 915 of the Revised Statutes those courts are not authorized to issue attachments in common law causes

against the property of a defendant, except as "provided by the laws of the State in which such court is held for the courts thereof," it follows that, as by the amendatory act of 1873, now part of § 5242 of the Revised Statutes, all power of issuing attachments against national banks before judgment has been eliminated from state statutes, there cannot be any laws of the State providing for such a remedy on which the Circuit Courts may act. The law in this respect stands precisely as it would if there were no state law providing for such a remedy in any case. It was suggested in argument that the prohibition extended only to the use of the remedy by state courts, and that the remedy itself still remained to be resorted to in the courts of the United States. But we do not so understand the law. In our opinion the effect of the act of Congress is to deny the state remedy altogether so far as suits against national banks are concerned, and in this way it operates as well on the courts of the United States as on those of the States. Although the provision was evidently made to secure equality among the general creditors in the division of the proceeds of the property of an insolvent bank, its operation is by no means confined to cases of actual or contemplated insolvency. The remedy is taken away altogether and cannot be used under any circumstances.

It was further said that if the power of issuing attachments has been taken away from the state courts, so also is the power of issuing injunctions. That is true. While the law as it stood previous to the act of July 12, 1882, 22 Stat. 163, c. 290, § 4, gave the proper state and federal courts concurrent jurisdiction in all ordinary suits against national banks, it was careful to provide that the jurisdiction of the federal courts should be exclusive when relief by attachment or injunction before judgment was sought. Until the act of 1882 the federal courts had ample authority to grant injunctions in proper cases, and all a person need do to invoke that authority was to bring his suit in one of those courts. Whether since the act of 1882 this remains so is a question for the consideration of Congress. Some amendment to existing legislation may be necessary, but this does not shed any light on the interpretation of the old

law. The difficulty arises from the change that has been made, not from the law as it stood originally.

We are, therefore, of opinion that the attachments in all the suits were illegal and void, because issued without any authority of law. But it is insisted that notwithstanding this the bonds are valid and may be enforced.

It is undoubtedly true that the sureties on a bond of this kind are estopped from setting up, as a defence to an action for a breach of its condition, any irregularities in the form of proceeding to obtain an attachment authorized by law which would warrant its discharge upon a proper application made therefor. As the purpose of the bond is to dissolve an attachment, its due execution implies a waiver both by the defendant and his sureties of all mere irregularities. So, too, it is no defence that the property attached did not belong to the defendant, or that it was exempt, or that the defendant has become bankrupt or is dead. In all such cases, where there was lawful authority for the attachment, the simple question is, whether the condition of the bond has been broken; that is to say, whether there has been a judgment in the action against the defendant for the payment of money which he has neglected for thirty days afterwards to make.

In the present case, however, the question is whether the bond creates a liability when the attachment on which it is predicated was actually prohibited by law. In other words, whether an illegal and therefore a void attachment is sufficient to lay the foundation for a valid bond to secure its formal dissolution. The bond is a substitute for the attachment, although not affected by all the contingencies which might have discharged the attachment itself. *Carpenter* v. *Turrell*, 100 Mass. 450, 452; *Tapley* v. *Goodsell*, 122 Mass. 176, 182. Such being the case, it necessarily follows that if there was no authority in law for the attachment, there could be none for taking the bond. If the attachment itself is illegal and therefore void, so also must be the bond which takes its place. Objections can be made to an attachment issued on proper legal authority, which cannot be used as a defence to a bond taken under the statute for its dissolution; but if there can be

no lawful attachment, there can be no valid bond for its dissolution. The case is to be considered as though there was no law whatever for the seizure of property by attachment before judgment in any case. As the taking of the property under such circumstances would be unlawful, so also would be the act of the magistrate in accepting the bond.

Neither is the bond binding as a common law bond. If the attachment had been valid, and the bond taken had not been in all respects such as the statute had required, it could nevertheless have been enforced as a common law bond, because it was executed for a good consideration, and the object for which it was given had been accomplished. But here the difficulty is that there was no lawful attachment, and therefore no lawful authority for taking any bond whatever. The bond is consequently neither good under the statute nor at common law, because there is no sufficient foundation to support it.

Objection is made to the relief which is sought in equity, because if the attachment bonds are void there is an adequate remedy at law in the suits that may be brought for their enforcement. If the suit in equity had been brought by the sureties to get rid of their obligation, this objection might be good; but such is not its character. The sureties have in their hands assets of the bank which the receiver seeks to reduce to his possession, and which they claim the right to hold until they have been fully indemnified against or discharged from liability on the bonds. The receiver says there is no liability, because the bonds are invalid; and to have that question settled once for all he has brought the persons interested, creditors as well as sureties, before the court in order that it may be conclusively adjudicated between them. Such a suit is clearly cognizable in equity. The sureties are in a sense stakeholders. They do not claim the securities unless they are liable on the bonds, and the suit, although not brought by them, is in the nature of an interpleader to save them "from the vexation of two proceedings on a matter which may be settled in a single suit." The decree will bind all alike, and if the sureties are held not to be liable it will conclude the creditors from all further proceedings against them on the bonds, and leave them

free to surrender the securities to the receiver. This will not affect the judgments that the creditors have recovered, any further than to limit their operation, so far as the receiver and the sureties on the attachment bonds are concerned, to the adjudication of the debts as claims entitled to dividends from the proceeds of the assets of the bank. To that extent, certainly, the court had jurisdiction in each of the suits after the insolvency; but as the attachments were void the judgments are inoperative as a basis of recovery upon the bonds.

*The judgment in each of the suits at law is affirmed, but the decree in the suit in equity is reversed, and the cause remanded with instructions to enter a decree setting aside and annulling the bonds which were given to dissolve the attachments, and enjoining each and all of the creditors, and those claiming under them, from proceeding in any manner to enforce the same against the sureties, and directing the sureties to surrender to the receiver the securities they hold for their indemnity.*