**In re RICHMOND PRODUCE COMPANY, INC., Debtor.**

**John T. KENDALL, Trustee, Plaintiff,**

v.

**Donald SORANI, the Estate of Patricia Sorani, Bank of California, Defendants.**

**And Related Cross–Actions.**

**Nos. C93–3845 MMC, C93–3852 MMC and C94–0428 MMC.**

United States District Court, N.D. California.

April 9, 1996.

Irving C. Kornfield, Kornfield, Paul & Bupp, P.C., Oakland, CA, and T. Scott Tate, Bronson, Bronson & McKinnon, San Francisco, CA, for Plaintiff Trustee, Appellee and Cross–Appellant John T. Kendall.

William J. Weir, J. Craig Gilliland, Richard M. Adler, Murphy, Weir & Butler, San Francisco, CA, for Defendant–Appellant Bank of California.

## MEMORANDUM AND ORDER

WILLIAM W SCHWARZER, District Judge.

John T. Kendall, the Chapter 11 trustee of Richmond Produce Company, Inc., brought a bankruptcy proceeding to avoid an allegedly fraudulent transfer in connection with a leveraged buyout of the debtor company. Following a ten-day bench trial, the bankruptcy court found that Bank of California, N.A., ("BanCal") was an immediate transferee in a fraudulent transfer of the company's property under federal and state law, and held BanCal liable to the trustee for $1.5 million plus prejudgment interest. BanCal appeals the judgment on several grounds. The trustee filed a limited cross appeal and appeals the bankruptcy court's order staying the judgment pending appeal. This court has jurisdiction under 28 U.S.C. § 158(a) and affirms.

### FACTUAL BACKGROUND

The facts are essentially undisputed. Richmond Produce Company, Inc. ("RPC"), a produce wholesaler, was owned by Donald and Patricia Sorani. In 1987, the Soranis agreed to sell their RPC stock to John W. Clow for approximately $4 million, about $2 million of which was to be paid in cash at the close of escrow and the remaining $2 million to be evidenced by a promissory note ("Clow note") secured either by a letter of credit for the full amount of the note or by a security agreement covering all RPC stock and all stock owned by Clow in a separate specified investment. The Soranis originally agreed to allow Clow to choose between the two. However, because the Soranis later believed the value of RPC assets to have decreased, they insisted at the close of escrow on December 3, 1987 that Clow obtain a letter of credit to secure the Clow note.

During the fall of 1987, Clow assumed control of RPC and attempted to obtain a line of credit to pay the cash portion of the purchase price. He received offers from three banks, including BanCal, but ultimately decided to obtain a short term loan from Imperial Bank to be made to RPC for $1.5 million. He collateralized the loan with a personal certificate of deposit from Imperial Bank.

In January 1988, Clow began negotiating with BanCal for the issuance of a letter of credit to secure the Clow note. Walter Reed, a BanCal loan officer, expressed concern about the enforceability of the transaction, specifically, whether RPC, which was to provide the funds to secure the letter of credit, would receive any benefit from it. He referred the matter to James Purvis in BanCal's legal department, who consulted the law firm of Cooper, White & Cooper. Ed Wynne of the Cooper firm, which represented both Clow and RPC, wrote Purvis a letter stating that Clow's personal funds would be used to secure the letter of credit and that the letter of credit would substantially benefit RPC. Purvis then advised Reed that the transaction was sound.

On March 11, 1988, Mechanics Bank advanced RPC a $1.5 million line of credit, which was secured by all of RPC's assets and Clow's personal guaranty and deposited into RPC's general checking account at Mechanics Bank. Clow then issued and delivered to Mechanics Bank a $1.5 million RPC corporate check payable to BanCal. Mechanics Bank negotiated the corporate check and issued a $1.5 million cashier's check ("cashier's check") payable to BanCal. Listed on the cashier's check as remitter was "Clow–Richmond Produce". Clow delivered the cashier's check to BanCal, purchasing a certificate of deposit in his own name, and pledging the CD ("BanCal CD") as security for a letter of credit.

Shortly after the close of escrow in early December 1987, RPC began experiencing cash flow problems resulting in a substantially lower credit rating, which exacerbated the

problems and left RPC with insufficient cash and credit to carry on business. In December 1988, RPC failed to pay its first installment real property taxes, constituting a default under its lease with the Soranis. The Soranis gave notice of default, and when it was not cured, made demand on the letter of credit. BanCal paid the Soranis and enforced its security interest in the BanCal CD.

In the end, Clow owned the Soranis' RPC stock, BanCal was paid in full, the Soranis received $1.5 million, and RPC had $1.5 million less cash. RPC filed for Chapter 11 bankruptcy protection, and the trustee brought a proceeding seeking to avoid the $1.5 million transfer under both 11 U.S.C. § 548(a)(2)(B) and Cal.Civ.Code §§ 3439.04(b) and 3439.05 (the state analogs of section 548(a)(2)), the state claims being assertable by virtue of 11 U.S.C. § 544(b). Recovery against BanCal was sought under 11 U.S.C. § 550(a).

## BANKRUPTCY PROCEEDINGS

After a ten-day bench trial, the bankruptcy court found the events of March 11, 1988 to constitute a fraudulent transfer of RPC's property under section 548(a)(2) and the analogous California law.[1] *In re Richmond Produce Co., Inc.,* 151 B.R. 1012 (Bankr. N.D.Cal.1993). It reasoned that since RPC (i.e., Clow) could have returned the cashier's check to Mechanics Bank any time before its delivery to BanCal, Clow's delivery and BanCal's receipt of the cashier's check effectuated the transfer of RPC funds. That transfer, the court stated, did not "provide[ ] [RPC] with value 'reasonably equivalent' to its loss of $1.5 million in cash" under § 548(a)(2)(A).

The court further found that although the evidence was inconclusive as to whether RPC was insolvent on March 11, 1988, the transfer rendered RPC insolvent by adding the Mechanics Bank loan and reducing shareholders' equity. The court specifically rejected the argument that Clow's "obligation" to repay RPC should be considered a corresponding debit entry, since Clow never assumed such an obligation and had no realistic ability to repay RPC within a reasonable time. It also found RPC to be undercapitalized, its operations apparently "to have been doomed from the time the December 3, 1987 escrow closed." 151 B.R. at 1020.

Finally, the court found that BanCal was not an initial but an immediate transferee of the cashier's check, and therefore BanCal was entitled to establish a "good faith" defense under section 550(b)(1).[2] It held that while BanCal participated in the transfer in good faith and for value, it failed to establish a defense since it did not act without knowledge of the voidability of the transfer. "BanCal had extensive knowledge of [RPC's] financial condition ... [and] knew the details

---

1. Section 548(a) provides in relevant part:

 The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily ...

 (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

 . . .

 (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

 (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

 (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

2. Section 550 provides in relevant part:

 (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 ..., 548 ... of this title, the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
 (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
 (2) any immediate or mediate transferee of such initial transferee.
 (b) The trustee may not recover under section (a)(2) of this section from—
 (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
 (2) any immediate or mediate good faith transferee of such transferee.

of the December 3, 1987 sale and the fact that Clow intended to heavily leverage his purchase of [RPC] stock." Thus, BanCal was "on notice that the proposed transfer would render [RPC] insolvent and/or under-capitalized." 151 B.R. at 1022.

Accordingly, the bankruptcy court held BanCal liable to the trustee for $1.5 million plus prejudgment interest from March 11, 1988.[3]

### ISSUES ON APPEAL

BanCal appeals on the grounds that: (1) BanCal was only a conduit and not a "transferee" under 11 U.S.C. § 550; (2) BanCal did not receive RPC property; (3) a trustee may not recover from a subsequent transferee where the trustee has not first sued the initial transferee and avoided the initial transfer; (4) BanCal lacked knowledge of the voidability of the transfer and is therefore immune from liability under section 550(b)(1); and (5) the bankruptcy court abused its discretion in awarding prejudgment interest.

The trustee cross-appeals on the basis that BanCal, not Clow, was the initial transferee. The trustee also appeals the order staying the judgment pending appeal.

### STANDARD OF REVIEW

 Review of questions of law is de novo; factual findings are reviewed for clear error. *In re Alcala*, 918 F.2d 99, 103 (9th Cir.1990). Mixed questions of law and fact are reviewed de novo. *Boone v. United States*, 944 F.2d 1489, 1492 (9th Cir.1991). A lower court's award of prejudgment interest is reviewed for abuse of discretion. *Home Sav. Bank, F.S.B., by Resolution Trust Corp. v. Gillam*, 952 F.2d 1152 (9th Cir.1991).

### DISCUSSION

1. *BanCal's Status as Immediate Transferee of RPC Property*

 a. *"Transferee" or "Conduit"*

 In *In re Bullion Reserve of N. America*, 922 F.2d 544 (9th Cir.1991), the Ninth

Circuit articulated the meaning of "transferee" under 11 U.S.C. § 550(a): "[W]e think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 548, quoting *Bonded Fin. Serv. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir.1988) (internal quotations omitted).

BanCal's reliance on *In re Bullion* for the proposition that it was merely a conduit for the transfer of RPC property is unpersuasive. BanCal contends that since the cashier's check was used by Clow to purchase a BanCal CD that was "dedicated to funding the Letter of Credit payable to Sorani," Ban-Cal had "no right to exercise dominion and control over the Certificate of Deposit until its right to do so matured upon the honoring of its Letter of Credit obligation to the Soranis." This court disagrees. In *In re Bullion*, the bank director entered a contract with the president of the debtor company to take a nonrecourse loan from the president (the funds for which the president fraudulently transferred from debtor to his personal account) in exchange for bank stock that was by the terms of the contract immediately pledged to the president as security for the loan. There, the Ninth Circuit held that

> even though the funds transferred from Saxon [the president] to Kopelson [bank director A] were used partially to purchase stock in Miller's [bank director B] name, Miller was under a *contractual duty to pledge the stock immediately* to Saxon. Miller had no "dominion over the money," nor could he "put the money to his own purposes."

*In re Bullion*, 922 F.2d at 549. In contrast, BanCal was not merely holding funds which it had a contractual duty immediately to pledge to Clow or another party. The cashier's check was paid to the order of BanCal, and once BanCal deposited the check and issued the CD which Clow pledged to BanCal as security for the letter of credit, BanCal

---

**3.** After its opinion and before judgment was entered, the bankruptcy court granted BanCal's request for prejudgment interest to be awarded from February 15, 1990, the date of the filing of the initial complaint, rather than from March 11, 1988. Appropriately, the trustee does not object to this decision.

had dominion over those funds. Although the CD was in Clow's name, it was BanCal, not Clow, who could "put the money to [its] own purposes." In other words, BanCal was "free to invest the whole amount in lottery tickets or uranium stocks." *See id.,* quoting *Bonded,* 838 F.2d at 894 (internal brackets omitted). Thus, BanCal had dominion and control over the $1.5 million originally transferred from RPC.

■ As the court below wrote:

As a practical matter, delivery of the Cashier's Check to BanCal must be viewed as a transfer. Prior to delivery, the Debtor could have returned the Cashier's Check to Mechanics Bank and had $1.5 million credited to its account. As a result of the delivery, BanCal was given the power to obtain $1.5 million from Mechanics Bank, and the Debtor lost that power.

151 B.R. at 1016. The court agrees that "it makes no sense to conclude that no transfer occurred" between RPC/Clow and BanCal, and therefore affirms the finding below that BanCal was a transferee and not a mere conduit.

#### b. *"Initial" or "Immediate" Transferee*

■ The trustee cross appeals on the ground that BanCal was an initial and not an immediate transferee of RPC property. However, the bankruptcy court correctly reasoned that this issue "depends on whether Clow exercised dominion and control over the Cashier's Check." *Id.* at 1021. The court agrees that "Clow was no mere messenger," *id.,* of the check, as he exercised complete dominion and control over the transaction and, more specifically, over the RPC funds used to finance his purchase of RPC. In fact, while the bankruptcy court held that "the Cashier's Check was transferred to Clow when he picked it up from Mechanics Bank," *id.,* Clow could have been deemed to have had dominion and control over the funds even before that—e.g., when he wrote

the RPC corporate check payable to BanCal and delivered it to Mechanics Bank. Thus, BanCal was an immediate transferee under section 550(a)(2).

#### 2. *Transfer of RPC Property*

■ This court also finds BanCal's argument that the cashier's check was not RPC property to be without merit. First, BanCal contends that before delivery to BanCal, the cashier's check was property of Mechanics Bank and that "the only interest RPC had (if any) was the theoretical right to cause return and cancellation of the Cashier's Check obtained by Clow from Mechanics Bank *prior* to its delivery by Clow to BankCal.... [T]his right was not transferred to BankCal ... [but] was *extinguished* by Clow's act of delivery." However, the court agrees with the bankruptcy court that California law, which determines the nature and extent of a debtor's interest in property, supports the view that the purchaser of a cashier's check retains a property interest in the check before it is delivered. 151 B.R. at 1016–17, citing *Garthwaite v. Bank of Tulare,* 134 Cal. 237, 241, 66 P. 326, 327 (Cal.1901); *Burke v. Mission Bay Yacht Sales,* 214 Cal.App.2d 723, 732, 29 Cal.Rptr. 685, 690 (Cal.App.4th Dist.1963).

BanCal unpersuasively argues that the applicability of *Burke,* upon which the bankruptcy court relied, is limited to the narrow group .of cases where a cashier's check was stolen and fraudulently delivered to the payee. However, as BanCal concedes, *Burke* is the only California authority on point, and *Burke* states broadly that where plaintiff purchased a cashier's check, she "would have had the right to cause it to be cancelled and her account credited with amount thereof" any time before delivery and therefore "[t]he check was [her] property ... until delivery" to the payee. The court sees no reason not to accept *Burke* as stating the law of California.[4]

---

**4.** A Ninth Circuit Bankruptcy Appellate Panel has explicitly confirmed the position of the bankruptcy court in the instant case:

 It is well-established in California law that the purchaser of a cashier's check retains a property interest in the cashier's check before it is delivered. The purchaser's rights "simu-

late" those of a drawer of an ordinary check....

 If this were not the case, then if a bank refused to pay a cashier's check at the purchaser's request because, for example, it was mistakenly made out to the wrong payee, the bank

BanCal further argues that "any right RPC may have had to obtain $1,500,000 from Mechanics Bank had been pledged to the Soranis" since the Soranis held a security interest in all RPC assets. However, BanCal has failed to show that the Soranis' lien created an ownership interest in RPC property. The bankruptcy court correctly held that "[p]rior to delivery, the Debtor [not the Soranis] could have returned the Cashier's Check to Mechanics Bank and had $1.5 million credited to his account."

Thus, the bankruptcy court's finding that the transfer of $1.5 million via the cashier's check was a transfer of RPC property is affirmed.

### 3. *Recoverability from BanCal*

BanCal incorrectly construes the "to the extent that a transfer is avoided" language in section 550 to mean that in order to recover from a subsequent transferee, the trustee must first successfully avoid the transfer with respect to the initial transferee. Such an interpretation conflates Chapter 11's avoidance and recovery sections and contradicts existing Ninth Circuit law.

Section 550 clearly provides for recovery from "the initial transferee ... *or* the entity for whose benefit the transfer was made *or* ... any immediate or mediate transferee". 11 U.S.C. §§ 550(a)(1) & (2) (emphasis added). The provision contains no language that suggests that recovery from immediate transferees is in any way dependent upon a prior action or recovery against the initial transferee.

Moreover, this circuit has explicitly rejected the argument that "§ 550(a) ... mean[s] that each element of § 547 [or 548] must be satisfied with respect to the party from whom recovery is sought under § 550." *In re Sufolla, Inc.*, 2 F.3d 977, 982 (9th Cir. 1993). On the contrary, "'avoidability is an attribute of the transfer rather than that of the creditor.' The 'to the extent that' language simply recognizes that transfers sometimes may be avoided only in part, and that only the avoided portion of a transfer is recoverable." *Id.*, quoting *In re Deprizio*, 874 F.2d 1186, 1195–96 (7th Cir.1989);[5] *see also Lippi v. City Bank*, 955 F.2d 599, 605 (9th Cir.1992) ("[A]voidance and recovery from transferees are distinct concepts under bankruptcy law ..." and "[t]he legislative history explains that 'Section 550 prescribes the liability of a transferee of an avoided transfer and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee.'") (citation omitted).

In short, once the trustee proves that a transfer is avoidable under section 548, he may seek to recover against any transferee, initial or immediate, or an entity for whose benefit the transfer is made.[6] Thus, because the bankruptcy court correctly found BanCal to be an immediate transferee of a fraudulent and thus avoidable transfer of RPC funds, BanCal may be held liable for the transfer, notwithstanding the absence of a suit or recovery against Clow.

### 4. *BanCal's "Knowledge of Voidability" of the Transfer*

As an immediate transferee, BanCal may not be held liable for a fraudulent transfer if it received the transfer (1) "for value," (2) "in good faith," and (3) and "without knowledge of the voidability of the transfer

would receive a windfall if the purchaser could not recover those funds.

[Similarly,] ... in case of conversion of the check, the law governing conversion of personal property applies, and an action may not be brought by either the issuer or acceptor of the instrument, nor by a payee who did not receive delivery.

*In re Lee*, 179 B.R. 149, 159 (Bankr. 9th Cir. 1995).

5. The Bankruptcy Reform Act of 1994, which amends section 550, has superseded the holdings in both *In re Sufolla* and *In re Deprizio* on the

separate question of whether a preferential transfer to a noninsider creditor that (1) is avoidable under section 547(b), (2) benefits insider guarantors, and (3) is made in the extended preference period, is recoverable from the creditor. However, that question is not at issue in the present case.

6. BanCal's reliance on *In re Slack–Horner Foundries, Co.*, 971 F.2d 577 (10th Cir.1992), is unpersuasive in light of contrary holdings in this circuit and Judge Seymour's telling dissent in *Slack–Horner* itself.

avoided." 11 U.S.C. § 550(b)(1). BanCal does not dispute the bankruptcy court's placing of the burden of proof of establishing a section 550(b)(1) defense on the defendant. *See In re Nordic Village, Inc.,* 915 F.2d 1049, 1055 (6th Cir.1990), *rev'd on other ground,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *but see Bonded Fin. Serv.,* 838 F.2d at 897–98. BanCal challenges only the bankruptcy court's finding that it was not without knowledge of the voidability of the transfer.

First, BanCal contends that the court below applied an incorrect legal standard by holding that BanCal had knowledge under section 550(b)(1) because it was "on notice" that it was receiving funds related to a fraudulent transfer. In the absence of Ninth Circuit authority on the issue, the bankruptcy court essentially applied a standard adopted widely by other courts, including the Seventh Circuit, which wrote:

> Imputed knowledge is an old idea, employed even in criminal law.... [T]he recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate. No one supposes that "knowledge of voidability" means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do. Some facts strongly suggest the presence of others; a recipient that closes its eyes to the remaining facts may not deny knowledge.

*Bonded Fin. Serv.,* 838 F.2d at 897–98; *see also In re Nordic Village,* 915 F.2d at 1056 ("[B]ecause of the words 'REMITTER: SWISS HAUS, INC.,' [on a cashier's check to the IRS] it cannot be said that the IRS acted without knowledge of the voidability of the transfer."). Similarly, in *In re Goodwin,* 115 B.R. 674, 677 (Bankr.C.D.Cal.1990), the bankruptcy court concluded that "knowledge of voidability" requires the transferee "have knowledge of sufficient facts that (i) puts the transferee on notice that the transfer might be avoidable or (ii) requires further inquiry into the situation and such inquiry is likely to lead to the conclusion that the transfer might be avoidable." *See also In re Concord Senior Hous. Found.,* 94 B.R. 180, 183 (Bankr.

C.D.Cal.1988). Given the impracticability of determining the absence of actual knowledge in specific cases, and the common application in other jurisdictions of the "notice" standard used by the bankruptcy court here, the court rejects BanCal's suggestion that section 550(b)(1) requires that "actual knowledge" must be found.

■ Second, BanCal disputes the sufficiency of the evidence to support the bankruptcy court's conclusion that BanCal was on notice that the March 11, 1988 transaction was fraudulent. BanCal claims in particular that it believed at all times RPC was a profitable company with a healthy balance sheet and that the letter of credit would be secured by Clow's personal funds. However, BanCal's portrayal of the facts is at best inconsistent with clear evidence that it was aware that RPC was experiencing financial difficulties as early as the fall of 1987 and that Clow's buyout of debtor's stock was highly leveraged. BanCal also claims that its representatives, "simply did not notice the remitter line [on the cashier's check] until after the letter of credit was issued." This court, like the court below, fails to find this credible. Even assuming BanCal overlooked clear evidence that RPC was a co-remitter on the check, such oversight would be unreasonable and would amount to "closing its eyes to the ... facts." *See Bonded Fin. Serv.,* 838 F.2d at 898.

Absent clear error, this court will uphold the bankruptcy court's factual findings and agrees that, under the standard articulated above, BanCal has failed to meet its burden of showing it was without knowledge of the voidability of the transfer.

## 5. *Prejudgment Interest*

"The award of prejudgment interest in a case arising under federal law rests within the sound discretion of the court." *Home Savings Bank, F.S.B. v. Gillam,* 952 F.2d 1152, 1161 (9th Cir.1991), citing *United States v. California State Bd. of Equalization,* 650 F.2d 1127, 1132 (9th Cir.1981), *aff'd* 456 U.S. 901, 102 S.Ct. 1744, 72 L.Ed.2d 157 (1982).

■ BanCal's contention that the bankruptcy court erred in applying a state prejudgment interest rate to a "judgment . . . based upon federal law, i.e., 11 U.S.C. § 550," is without merit. The prejudgment interest awarded below was based on an action brought concurrently under federal and state law. Moreover, the Ninth Circuit has explicitly held that "[state] law regarding prejudgment interest is applicable via 11 U.S.C. § 544(b)," the provision that allows the trustee in the instant case to assert his Cal.Civ. Code §§ 3439.04(b) and 3439.05 claim. *In re Agric. Research and Technology Group, Inc.,* 916 F.2d 528, 541 (9th Cir.1990). BanCal's emphasis on section 550 is misplaced, since that provision is limited to identifying the entities from whom recovery may be made and is not the legal basis for the judgment, which is based on sections 548 and 544(b). By virtue of section 544(b), the court's application of state law is appropriate in awarding prejudgment interest.

■ Finally, BanCal cites no authority for its claim that the bankruptcy court abused its discretion in not articulating specific "facts or findings . . . which would justify [the court's prejudgment interest] award." In the context of the rest of the bankruptcy court's opinion, it is obvious that the award was intended to compensate RPC for the loss of the use of the $1.5 million which Clow caused to be fraudulently transferred from RPC funds.

### 6. *Stay of Execution of Judgment*

■ In a post-judgment order, the bankruptcy court held:

Having considered the authorities cited by the parties and the applicable statutes and rules, the Court is persuaded that 12 U.S.C. § 91 should be construed to preclude any pre- or post-judgment remedies directing to securing or satisfying a judgment against a national banking association until all appeals of the judgment have been concluded regardless of whether the action has been prosecuted in state or federal court.

Order (Bankr.N.D.Cal., July 12, 1993) at 1. The trustee argues that this court should vacate the order on the following grounds:

(1) section 91 is inapplicable to cases brought in federal court; (2) the judgment is "final" under section 91; (3) section 91 does not apply to judgment liens such as the recordation of abstracts of judgment; and (4) California law and public policy require a national bank to post a bond to secure a stay of execution of judgment. This court reviews the bankruptcy court's legal conclusions de novo and affirms.

■ First, the trustee's argument that section 91 does not apply to remedies in suits or proceedings in federal court is meritless. As the bankruptcy court recognized, the Supreme Court has explicitly held that the predecessor to section 91 was intended to apply to actions in federal as well as state courts. *Pacific Nat'l Bank v. Mixter,* 124 U.S. 721, 8 S.Ct. 718, 31 L.Ed. 567 (1888). This court agrees with the bankruptcy court that while section 915, upon which *Mixter* partially relies, is no longer in effect, the current federal civil procedure rules have the same statutory effect on section 91 as section 915 had on the predecessor to section 91. *See also Third Nat'l Bank in Nashville v. Impac Ltd., Inc.,* 432 U.S. 312, 318–19, 97 S.Ct. 2307, 2311–12, 53 L.Ed.2d 368 (1977) (citing *Mixter* for the proposition that "[a]lthough the statutory prohibition [in section 91] was not directly applicable to federal suits, the federal courts were authorized to issue attachments only as provided by state law" and holding that the statutory prohibition against attachments in federal and state courts applies regardless of the solvency of the national bank). Moreover, the trustee's argument that federal Rule 69 on executions rather than Rule 64 on prejudgment seizures should apply has no consequence, since both rules make state law remedies available to federal courts. *Compare* Fed.R.Civ.P. 64 ("[A]ll remedies providing for seizure of . . . property for . . . securing satisfaction of judgment . . . are available under the circumstances and in the manner provided by the law of the state in which the district court is held . . . .") *and* Fed.R.Civ.P. 69 ("The procedure on execution . . . shall be in accordance with the practice and procedure of the state in which the district court is held . . . ."). Thus, we agree that section 91

applies to federal as well as state court proceedings.

■■■■■ Similarly, this court agrees with the bankruptcy court that "final judgment" under section 91 means a judgment on which all appeals have been concluded. As the only circuit to have addressed this issue held:

> [T]he term 'final judgment' as used in 12 U.S.C. § 91 means a judgment on the merits which is no longer subject to examination on appeal, either because of disposition on appeal and conclusion of the appellate process, or because of the passage, without action, of the time for seeking appellate review.

*United States v. Lemaire,* 826 F.2d 387, 390 (5th Cir.1987). The trustee's reference to *Melkonyan v. Sullivan,* 501 U.S. 89, 96, 111 S.Ct. 2157, 2162, 115 L.Ed.2d 78 (1991) (suggesting that the definition of "final judgment" in the Equal Access to Judgment Act as final and not appealable is "unusual") is unpersuasive, since that case provides no basis for distinguishing the meaning of "finality" under section 91. For the purposes of section 91, finality means the point at which all appeals have been concluded or the time to file an appeal has expired. Thus, this court agrees with the reasoning that "[i]t would be inconsistent with th[e] intention [of *Mixter*] to terminate the protection [against state remedies] upon entry of judgment by a federal court but not until exhaustion of the appellate process if the action is brought in state court." Order at 2.

■■■■ Third, the trustee fails to provide any authority for its argument that a recordation of an abstract of judgment does not fall within the broad scope of section 91. The statute clearly proscribes any "attachment, injunction, or execution," and the California case cited by the trustee does not address whether a recordation may, as the bankruptcy court has ruled, be described as a "post-judgment attachment." *See Industrial Indemnity Co. v. Levine,* 49 Cal.App.3d 698, 699, 122 Cal.Rptr. 712, 713 (Cal.App.1st Dist.1975) ("Recordation of an abstract of judgment merely creates a lien upon real property of the judgment debtor; such recordation is not an execution upon judgment.") Thus, in the absence of law to the contrary,

this court agrees that "[a]n abstract of judgment can fairly be described as an attachment" and "[n]othing in § 91 limits the prohibition to pre-judgment attachments." Order at 3.

■■■ Finally, the trustee's argument that California practice and public policy require the posting of a supersedeas bond during pendency of an appeal is without merit, since section 91, which has no such requirement, displaces any California law or practice that might be implicated by Rules 64 and 69. Rules 64 and 69 invoke state law and practice, respectively, "except that any statute of the United States governs to the extent that it is applicable." Section 91 governs "any suit, action, or proceeding" against a national bank. Thus, BanCal need not post a supersedeas bond for the purposes of the present case.

### CONCLUSION

The bankruptcy court's judgment and its order staying any post-judgment remedies are affirmed. The trustee is entitled to recover from BanCal the sum of $1.5 million plus prejudgment interest from February 15, 1990.